THE COUNTY OF DODGE ON BEHALF OF MEMORIAL HOSPITAL OF DODGE COUNTY, NEBRASKA, APPELLEE, V. DEPARTMENT OF HEALTH OF THE STATE OF NEBRASKA, APPELLANT.

355 N.W.2d 775

Filed September 21, 1984.   No. 83-133.

Paul L. Douglas, Attorney General, and Marilyn B. Hutchinson, for appellant.

Thomas B. Thomsen of Sidner, Svoboda, Schilke, Wiseman, Thomsen & Holtorf, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Regarding the Nebraska Health Care Certificate of Need Act, Neb. Rev. Stat. §§ 71-5801 to 71-5872 (Reissue 1981), the Department of Health of the State of Nebraska (department) appeals the judgment of the district court for Lancaster County which reversed the decision of the appeal board of the Nebraska Health Care Certificate of Need Appeal Panel (appeal panel). The appeal panel had held that Memorial Hospital of Dodge County (Memorial Hospital) could purchase nuclear medicine equipment but could not lease such equipment as requested by Memorial Hospital in its application to the department. We affirm.

In October 1981 Memorial Hospital applied to the department and sought approval to lease new nuclear medicine equipment, namely, a 5-year lease of a "new . . . stationary nuclear medicine gamma camera with a large field of view and appropriate collimators" and "additional periphery equipment" including an "EKG monitor and an image processor." Memorial Hospital applied to the department for a certificate of need because the expenditure for the nuclear medicine equipment exceeded $100,000. See § 71-5830. According to the application, "[a]cceptability and quality of the images produced by the [hospital's] present camera are not

up to medically desired standards."

The department ruled that Memorial Hospital could purchase, not lease, the new equipment. Memorial Hospital appealed to the appeal panel. See §§ 71-5860 et seq.

When Memorial Hospital applied, § 71-5830 authorized "the purchase, acquisition, or lease of clinical equipment" by a hospital. Section 71-5853 in pertinent part provided: "The department shall, by rules and regulations, provide criteria for: . . . (3) The immediate and long term financial feasibility of the proposal, as well as the probable impact of the proposal on the costs of and charges for providing health services by the person proposing the new institutional health service."

Also, when Memorial Hospital filed its application, the department had specific rules and regulations pertaining to a hospital's proposal, namely, rule 33, which provided in part as follows:

> The proposal must be the most effective alternative for satisfying the need, in terms of cost, efficiency, and appropriateness, and in terms of whether the development of alternatives is practicable. [(5)(b)iii.]
>
> The proposal must show that the financial requirements and involvements are such that the proposal can be developed and provided to the community on a continuous basis for the period of the life of the assets. . . . [A]vailability of the proposed means of financing . . . must be the least costly alternative available. [(5)(c)iv.]
>
> Any increase in costs of the service of the applicant and on the costs of related services in the community must be reasonable and justified by the severity of the problem or need and by the impact the proposed services will have on the need. [(5)(d).]

The purchase price for the nuclear medicine equipment sought by Memorial Hospital was $160,000. If Memorial Hospital were authorized to lease the equipment, the lease would be for a term of 5 years, with monthly payments of $3,536 and annual rental of $43,200, or total rental of approximately $216,000 for the entire term. The "current prime rate of interest" for any loan to the hospital was 16 percent in November 1981.

At the hearing before the appeal panel, Richard Kielman, vice president of support services for Memorial Hospital, advocated the hospital's leasing replacement equipment, described the proposed equipment, and recounted the basis of need for the new equipment. Kielman testified about the nuclear medicine camera and image processor. The image processor is basically a computer used with the gamma camera. Kielman described the repair costs for the hospital's present equipment and the "down time" when the equipment malfunctioned. Kielman's testimony about the hospital's need for the new equipment can be summarized as follows: nuclear medicine has changed "dramatically" over the last 10 years; there have been rapid changes in radiology due to technological innovations in the field of electronics; and, unless the present equipment is replaced by new equipment, the unreliability of the present equipment would necessitate termination of existing services to the hospital's patients, drawn from seven counties. Further, according to Kielman, through contact with various hospitals, the salvage value of any replacement equipment would be as low as $500 at the end of the 5 years, the anticipated useful life of replacement equipment. The proposed 5-year lease took into account such minimal salvage value of replacement equipment.

Kielman further testified that Memorial Hospital's reserve funds had already been earmarked for specified construction projects. Memorial Hospital was built in 1939, and there has been no significant renovation of the hospital since its construction. Reserve funds of the hospital were destined for renovation and remodeling of the older parts of the hospital, kitchen facilities, and roofing. Memorial Hospital planned to commence the designated remodeling and renovation within 2 years after application for the nuclear medicine equipment. The department did not dispute the necessity of the projects for remodeling or renovating the hospital and did not contest the hospital's reserve or the costs of the various projects to be paid from the reserve funds on hand.

Also testifying on behalf of Memorial Hospital before the appeal panel was Harvey Johnson, a certified public accountant specializing in hospital accounting and financing.

Johnson testified that, in comparing leasing and purchasing the equipment sought by Memorial Hospital, a lease was economically more advantageous to the hospital. In support of his conclusion favoring the lease, Johnson explained that under the proposed lease of equipment, Memorial Hospital would pay interest at 12.157 percent. Interest was implicit in the lease arrangement because the lessor paid interest on the equipment purchased and thereafter leased to the hospital. Presently, Memorial Hospital's reserve funds were earning interest at an investment rate of 15 percent. Under a lease situation and existing medicare and medicaid programs, the federal government would reimburse the hospital for 45 percent of the leasing costs, while under the purchase arrangement the federal government would reimburse the hospital only 45 percent of the depreciation for the equipment. The amount of federal reimbursement related to depreciation was less than the reimbursement anticipated from an equipment lease. According to Johnson, by taking the more favorable interest rate for investment of hospital funds and the greater reimbursement from medicare and medicaid as a result of an equipment lease, a lease produced a financial advantage to Memorial Hospital. To illustrate this point, Johnson demonstrated that $160,000 (cost of equipment if purchased) placed in a separate fund charged with payment of equipment rental but increased by interest income and federal reimbursements would contain $149,359 at the end of the 5-year lease. On the other hand, were the hospital to purchase the equipment by using reserve funds, the special fund would be reduced to zero on account of the purchase. In view of the lower federal reimbursement from medicare and medicaid in the purchase situation, there would be the sum of $63,540 attributable to the purchased equipment at the end of 5 years.

Johnson further testified that "[t]he issue is the lost interest." To recoup interest lost by the hospital's withdrawing its reserve funds from investment and interest-income production, Memorial Hospital would have to recover such loss from the "private-paying patient." If the hospital lost the revenue from investments, Memorial Hospital would "have to raise [its] charges more than what that loss is across the board . . . to get it

back through the private-paying side." Even without reimbursement due to medicare and medicaid, according to Johnson, a lease was more advantageous than purchase of the equipment. Johnson testified that in terms of a present value analysis, the cost of the lease was $151,940, while the cost of a purchase was $160,000, a difference of a little over $8,000. In Johnson's final analysis the "total charges and costs to the hospital to provide this service [new equipment] would be less" if the new equipment was leased rather than purchased.

A financial feasibility analyst testified for the department and acknowledged that she did not consider the loss of interest income which would be sustained by Memorial Hospital's withdrawing its reserve funds from investment. The department's analyst also testified that in considering "cost containment," that is, the least costly method of a hospital's acquiring new equipment, one has to consider how acquisition affects medicare and medicaid "[t]hat's paid for by all taxpayers."

After reviewing the evidence, the appeal panel found, on April 8, 1982:

> Leasing the said equipment is more favorable to the Hospital itself because the Hospital would receive more Medicare and Medicaid reimbursement if the equipment were leased, but the cost of this increased reimbursement would be placed on health care consumers and taxpayers. The increased cost to health care consumers and taxpayers is not offset by the advantage to the Hospital.

With this finding the panel concluded: "The Hospital has failed to establish that leasing the said equipment is the most effective and least costly alternative available, or that the increase in costs is reasonable and justified, as required by sections (5)(b)iii., (5)(c)iv., and (5)(d) of Rule 33 of the Department." The appeal panel granted Memorial Hospital a certificate of need for the new equipment "on the condition that the Hospital use its own funds to purchase the equipment rather than leasing it."

Memorial Hospital appealed to the district court for Lancaster County. See Neb. Rev. Stat. § 84-917 (Reissue 1981). Finding that the appeal panel's decision directing a purchase of

the equipment was contrary to law and not supported by substantial evidence, the district court ordered that Memorial Hospital be permitted to obtain the nuclear medicine equipment by lease rather than by purchase.

This court has stated that "[w]hen reviewing such appeals before this court . . . we need only determine if the proper rules of law have been applied and if the decision reached by the board or agency is supported by competent evidence in the record." *Lambert v. Nebraska Cr. Vict. Rep. Bd.*, 214 Neb. 817, 821, 336 N.W.2d 320, 323 (1983).

The language of § 71-5853 is clear that the costs of providing the service include the costs to the applicant proposing the health service. Because the statute is plain and unambiguous, the word "cost" will be given its ordinary meaning. See *Central Park Pharm. v. Nebraska Liq. Cont. Comm.*, 216 Neb. 676, 344 N.W.2d 918 (1984). Cost is defined as: "Expense; price. The sum or equivalent expended, paid or charged for something." Black's Law Dictionary 312 (5th ed. 1979). Thus, the term "costs" as used in § 71-5853 has a very broad meaning, and includes many factors besides the purchase price of proposed equipment. In this case Memorial Hospital has shown that varied interest rates and different reimbursements from medicare and medicaid are important factors affecting cost to the hospital in obtaining the nuclear equipment. Under the facts presented it was obvious to the appeal panel that the 5-year lease was the least costly arrangement for Memorial Hospital. Even the appeal panel recognized this fact, when it found that "[l]easing the said equipment is more favorable to the Hospital itself because the Hospital would receive more Medicare and Medicaid reimbursement if the equipment were leased."

Another compelling facet of cost to Memorial Hospital is the loss which occurs when the hospital's reserve funds are required to purchase the proposed equipment. As a consequence of the hospital's reduced reserve funds, lost interest revenue otherwise produced by investment is an expense incurred by the hospital. Also, if funds already earmarked for needed remodeling and renovation were diverted to purchase the nuclear medicine equipment, planned remodeling and renovation would undoubtedly be accomplished through loans bearing interest at

a "prime rate" of 16 percent, approximately 4 percent in excess of the interest rate attributable to the lease. Memorial Hospital would not only have to pay added and greater interest to replenish construction funds already committed but would be penalized for foresight in setting aside an appropriate reserve to cover necessary construction. Interest, either as lost revenue from investment or as the price paid for money to complete needed construction, affects the cost to Memorial Hospital in obtaining the proposed equipment. Restoration of the hospital's diminished reserve to defray remodeling and renovation costs will be a burden on the patient-consumer in the form of increased charges for using the proposed equipment, and perhaps by an increase in overall hospital charges apart from the use of the proposed equipment. Anything affecting costs to the hospital in turn affects hospital charges for the use of the equipment to be obtained. In this manner, "costs of and charges for" the services provided through the new equipment, as indicated in § 71-5853, are inextricably related.

The appeal panel determined that Memorial Hospital's leasing the proposed nuclear medicine equipment would increase cost to the "taxpayers." Whether the appeal panel was concerned about taxpayers statewide or nationwide is not clear from the decision of the panel. Nowhere in § 71-5853 is there any explicit reference or any statutory language susceptible to a reasonable inference that taxpayers' cost is a valid consideration for a certificate of need. Likewise, the derivative cost to taxpayers on account of the governmental programs of medicare and medicaid is not a criterion to be utilized in passing on a hospital's application for a certificate of need. Whether cost to taxpayers should be a factor in disposing of a hospital's application is a matter of policy with so far-reaching fiscal ramifications that such determination is more appropriately left to the people of Nebraska through their representatives in the Legislature, not to a governmental agency. In any event, neither § 71-5853 nor the rules and regulations of the department contain any indication that cost to taxpayers legitimately affects a hospital's application under the Nebraska Health Care Certificate of Need Act. Were the appeal panel's interpretation of the law accepted, no hospital could be

authorized to lease equipment under the circumstances presented in this case, because a lease would invariably result in greater reimbursement from medicare and medicaid and would derivatively increase the cost to taxpayers who ultimately bear the tax-supported programs. Thus, in the case before us the appeal panel's interpretation of its rules, regulations, and the Nebraska Health Care Certificate of Need Act frustrates prospective leasing notwithstanding statutory authority found in § 71-5830.

The Legislature can delegate to an administrative agency the power to make rules and regulations to implement the policy of a statute. *Rowe v. W. Va. Dept. of Corrections*, ____ W. Va. ____, 292 S.E.2d 650 (1982). However, the agency is limited in its rule-making authority to the powers delegated to it by the statute which it is to administer. *State ex rel. Marsh v. Nebraska St. Bd. of Agr.*, 217 Neb. 622, 350 N.W.2d 535 (1984); *Bond v. Nebraska Liquor Control Comm.*, 210 Neb. 663, 316 N.W.2d 600 (1982). In order to be valid a rule or regulation must be consistent with the statute under which the rule or regulation is promulgated. *United States v. Larionoff*, 431 U.S. 864, 97 S. Ct. 2150, 53 L. Ed. 2d 48 (1977). However, the Department of Health, by its interpretation of § 71-5853, has undertaken to incorporate into the Nebraska Health Care Certificate of Need Act a criterion not found in the statutory framework of the act itself. An administrative agency cannot use its rule-making power to modify, alter, or enlarge provisions of a statute which it is charged with administering. *Cray v. Kennedy*, 230 Kan. 663, 640 P.2d 1219 (1982). As a corollary to the foregoing, an administrative agency cannot interpret its rules and regulations in such a manner so that self-interpreted rules and regulations contravene the statute which the agency is obliged to administer.

An integral part of the department's and appeal panel's decision is application of an improper criterion for a certificate of need. The standard utilized by the department and the appeal panel is contrary to the Nebraska Health Care Certificate of Need Act. Once such improper criterion is removed as a consideration in this case, there is not substantial evidence to support the departmental decision on the application of

Memorial Hospital. In fact, the substantial evidence establishes that a lease of the proposed equipment is the most advantageous course of action to Memorial Hospital in terms of costs. Therefore, the judgment of the district court for Lancaster County is affirmed.

AFFIRMED.