CORNHUSKER CHRISTIAN CHILDREN'S HOME, INC., A NEBRASKA NONPROFIT CORPORATION, APPELLEE, V. DEPARTMENT OF SOCIAL SERVICES OF THE STATE OF NEBRASKA ET AL., APPELLANTS.
416 N.W.2d 551

Filed December 11, 1987.    No. 86-055.

Robert M. Spire, Attorney General, and Royce N. Harper, for appellants.

Steven G. Seglin of Crosby, Guenzel, Davis, Kessner & Kuester, for appellee.

Boslaugh, C.J., Pro Tem., White, Hastings, Caporale, Shanahan, and Grant, JJ., and Colwell, D.J., Retired.

Per Curiam.

This is an appeal from a judgment entered by the district court for Lancaster County in favor of Cornhusker Christian Children's Home, Inc. (Cornhusker), and against the Department of Social Services (DSS) of the State of Nebraska. In December 1984 Cornhusker brought a declaratory action, asserting that the DSS regulation in Neb. Admin. Code tit. 474, ch. 6, § 6-005.26K (1983) (Regulation 6-005.26K) contravenes state common and statutory law (Neb. Rev. Stat. §§ 28-1413 (Reissue 1985) and 43-708 (Reissue 1984)); exceeds DSS' authority under state law (Neb. Rev. Stat. § 71-1904 (Reissue 1986)); establishes an arbitrary and capricious classification between the regulation of physical punishment imposed in child-caring agencies and that of family day-care homes; and violates the Nebraska and U.S. Constitutions under the due process and equal protection clauses of U.S. Const. amend. XIV. The district court found that the public policy of the State of Nebraska authorizes the use of corporal punishment upon children residing in child-caring facilities. The district court further found that a parent may delegate authority to

administer reasonable corporal punishment and that persons in loco parentis have the authority to use reasonable corporal punishment for discipline and control of children placed in their care. The district court also found that the distinction made by DSS between child-caring facilities and family day-care homes with respect to the use of corporal punishment was arbitrary and capricious. The district court then held that the subject regulation was void and unenforceable, since it exceeded the authority and power granted to DSS under state law. DSS has appealed and requests that this court reverse the judgment of the district court, thereby upholding the regulation and the prohibition against the use of physical punishment as a proper expression of DSS' duty to promulgate rules necessary for the care and protection of children in Nebraska.

Cornhusker is a nonprofit corporation licensed by the State of Nebraska as a child-caring agency to provide 24-hour residential care for children placed in the agency by parents, courts, and DSS. Timothy Loewenstein, a member of Cornhusker's board of directors, described the Cornhusker home as composed of a number of cottages under the control of various houseparents who assume the responsibility of representing the children's parents. Situated on a 160-acre ranch, each cottage consists of a large, seven-bedroom home containing kitchen and dining room facilities, a social area, and a bedroom area. Cornhusker is licensed to provide necessary care for 19 children; the home presently cares for 4 girls and 11 boys, ranging in age from 8 to 16 years. In recent months two of the children were placed in the home by the State, and the remainder of the children were privately placed by their parents or guardians. Since Cornhusker's inception as a child-caring agency, approximately two-thirds of the children have been placed in the home by the courts.

Loewenstein also testified that Cornhusker's primary responsibility is to provide a suitable environment for the care and proper development of the children under its control. Between 1973 and 1983, an established ingredient of Cornhusker's disciplinary policy endorsed the spanking of children on the buttocks for purposes of discipline and control. The precise language of this pre-1983 disciplinary policy

provided for the use of "[c]orporal punishment such as a spanking on the buttocks by the open hand or a suitable instrument for the purpose of inflicting temporary pain."

In September 1983 DSS promulgated a regulation prohibiting the use of physical punishment in child-caring agencies. The regulation is expressed in Regulation 6-005.26K:

Discipline: Each agency shall develop written policies regarding discipline.

Agency staff shall:

1. Use discipline only as a learning process in which certain specified consequences are the result of unacceptable behavior; and

2. Never use the following as discipline:

a. Physical punishment or abuse;

b. Denial of necessities;

c. Chemical or mechanical restraints; or

d. Derogatory remarks, abusive or profane language, yelling or screaming, or threats of physical punishment.

Under Regulation 6-005.26K, physical punishment was prohibited in all child-caring facilities licensed by DSS; however, the limited use of physical punishment was allowed in family day-care homes. Under protest, Cornhusker amended its disciplinary policy to conform to Regulation 6-005.26K, which prohibited the use of physical punishment, in order to ensure that its license would be renewed as a child-caring facility.

Prior to October 1983, DSS approved of Cornhusker's disciplinary policy authorizing a houseparent to spank a child on the buttocks by applying an open hand or a suitable instrument for the purpose of inflicting temporary pain. Loewenstein testified that the former policy approving corporal punishment was applied as a last resort under controlled situations, and only after explaining to the child the reason for such an application of spanking, followed by the administration of the spanking itself. According to Loewenstein, physical punishment had the power of a deterrent, and corporal punishment was necessary to cause a child to change his behavior and conform with the standards that were expected. In the absence of corporal punishment,

Cornhusker has encountered various difficulties with the children's behavior. Cornhusker's former policy of spanking children promoted the welfare of the children entrusted to Cornhusker's care. Every parent who has made a private placement of his or her child with Cornhusker has expressly granted permission or encouraged Cornhusker to apply corporal punishment when the child disobeys the policies or rules of the home. However, Cornhusker has not used corporal punishment to effectuate its disciplinary policies subsequent to DSS' regulation proscribing physical punishment in child-caring agencies.

DSS called witnesses to testify with respect to Regulation 6-005.26K. James B. Maney was involved in the development of the current standard prohibiting the use of physical discipline in child-caring agencies. Maney acted as project manager for a DSS task force which reviewed regulations governing the licenses for group homes and child-caring agencies. Chartered in May 1978, the task force was provided with the authority to review current policy regarding the process for the issuance of licenses for group homes and child-caring agencies, and to do whatever research was necessary to provide recommendations to DSS about the revision of both the license process and the requirements. The task force's research involved the review of current disciplinary policies in child-caring agencies. Maney testified that the adoption of the corporal punishment regulation was based upon model regulations issued by the Department of Health and Human Services and by a "consortium of providers, administrators of licensing programs and various professionals in the field of child care." These regulations were to be used by State agencies as a model for their own formulation of licensing regulations. Maney noted that these model standards uniformly forbid the use of corporal punishment.

Maney testified that DSS permits spanking, with parental consent, in family day-care centers, but does not allow spanking in child-caring agencies. This family day-care regulation admonishes the day-care provider to "obtain prior written permission from the parent(s) before spanking children (only the open hand on the buttocks) to prevent them from

harming themselves, other persons, or property." Neb. Admin. Code tit. 474, ch. 6, § 6-001.15B4(3) (1984). Maney defined a family day-care center as a private home providing care for a part of the day for children under the age of 12.

As an alternative method of discipline, Maney admitted that DSS approves of a child-caring agency's use of a lockup facility. Maney explained that a lockup facility is a room employed by a child-caring agency when the agency is faced with a crisis situation, including situations in which the agency seeks to limit a child's behavior. The DSS task force recommendations listed the lockup facility as an acceptable method of punishment, but recommended that "[t]he following types of punishment shall be clearly excluded: slapping, spanking, paddling, belting, and limiting basic food requirements."

Debra Dawson testified for DSS concerning her role in reviewing, revising, and developing licensing policies, procedures, and regulations. Prior to her current position, Dawson was responsible for the administration of the day-care licensing program before January 1, 1984. Dawson testified that DSS' licensing of day-care facilities includes three types of day-care homes: group day-care homes, day-care centers, and preschool facilities. Residential facilities encompass foster homes, group homes, child-caring agencies, and child-placing agencies.

Explaining the differences between residential care and day care, Dawson testified that the differentiating factor involved in residential care is the 24-hour care provided to the children. Dawson related that residential care often involves children who are placed outside of their parents' custody because of problems within the family. Dawson further testified there were a number of reasons for allowing physical punishment in family day-care homes, while proscribing physical punishment in child-caring facilities. First, children in day-care homes infrequently come from abusing families. Moreover, the children's parents visit the day-care home twice a day. Second, Dawson explained that day-care homes have small numbers of children, and a significant number of the day-care providers and the children's parents believed that day-care homes should permit spanking, with certain restrictions. The primary

consideration, according to Dawson, is that children within the day-care home setting are within their parents' custody; conversely, children in residential care settings are usually placed in the agency by the courts or DSS, and are not in the custody of their natural parents. Finally, child-caring facilities are group-oriented, more institutional and restrictive, and less family-like. As a result, the child-caring facility is, in Dawson's words, "very little like a family situation."

On appeal to this court, DSS asserts numerous assignments of error; however, these can be grouped into four assignments. DSS maintains that the district court erred in holding that the public policy of the State of Nebraska authorizes the use of corporal punishment upon children residing in child-caring facilities; in holding that persons who stand in loco parentis have an affirmative right to use reasonable corporal punishment, thus allowing parents to delegate to third parties the authority to administer corporal punishment; in holding that DSS exceeded its authority under state law in promulgating a regulation prohibiting the use of corporal punishment upon children residing in licensed child-caring agencies; and in holding that DSS' distinction between the use of corporal punishment in child-caring facilities and family day-care homes is arbitrary and capricious. Underlying these assignments of error is DSS' position that the corporal punishment regulation is a proper expression of the State's parens patriae power to set standards for the care and protection of children within its jurisdiction.

In the present case, Cornhusker alleged, and the district court declared, that certain statutory provisions and Nebraska case law express a State public policy precluding DSS from prohibiting corporal punishment in child-caring agencies, parents may delegate to those in loco parentis the authority for corporal punishment of children, DSS exceeded its statutory power to promulgate regulations, and DSS' regulation prohibiting corporal or physical punishment is arbitrary and capricious. These are questions of law. In an appeal from a declaratory judgment, the Supreme Court, regarding questions of law, has an obligation to reach its conclusion independent from the conclusion reached by the trial court. *Johnston v.*

*Panhandle Co-op Assn.*, 225 Neb. 732, 408 N.W.2d 261 (1987); *Boisen v. Petersen Flying Serv.*, 222 Neb. 239, 383 N.W.2d 29 (1986); *OB-GYN v. Blue Cross*, 219 Neb. 199, 361 N.W.2d 550 (1985).

DSS assigns as error the district court's determination that Nebraska public policy authorizes reasonable corporal punishment in licensed child-caring agencies. The district court based its conclusion upon two sources of law that purportedly express a public policy in favor of reasonable corporal punishment. Initially, the district court relied upon §§ 28-1413 and 43-708 as the primary statutory provisions expressing the Nebraska public policy in favor of corporal punishment.

Section 28-1413 provides in pertinent part:

The use of force upon or toward the person of another is justifiable if:

(1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor or a person acting at the request of such parent, guardian or other responsible person and:

(a) Such force is used for the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of his misconduct; and

(b) Such force used is not designed to cause or known to create a substantial risk of causing death, serious bodily harm, disfigurement, extreme pain or mental distress or gross degradation; or

(2) The actor is a teacher or a person otherwise entrusted with the care or supervision for a special purpose of a minor and:

(a) The actor believes that the force used is necessary to further such special purpose, including the maintenance of reasonable discipline in a school, class or other group, and that the use of such force is consistent with the welfare of the minor; and

(b) The degree of force, if it had been used by the parent or guardian of the minor, would not be unjustifiable under subdivision (1)(b) of this section . . . .

Section 43-708, in turn, provides:

No official, agent or representative of the Department

of Social Services shall, by virtue of sections 43-701 to 43-709, have any right to enter any home over the objection of the occupants thereof or to take charge of any child over the objection of the parents, or either of them, or of the person standing in loco parentis or having the custody of such child. Nothing in sections 43-701 to 43-709 shall be construed as limiting the power of a parent or guardian to determine what treatment or correction shall be provided for a child or the agency or agencies to be employed for such purposes.

We respectfully disagree with the district court in its conclusion that public policy in Nebraska provides a child-caring agency with an affirmative right to apply reasonable corporal punishment. Section 28-1413 is found in chapter 28, article 14, and is a criminal defense provision of the Nebraska Criminal Code. Section 28-1413 enumerates several classes of persons, including parents, guardians, teachers, and others, who, if prosecuted for an offense involving otherwise criminal force exerted on or toward a minor, may assert a defense of justifiable force regarding that minor. Section 28-1413, however, does not contain any language which, in the area of civil law, precludes the State from regulating the use of force by these same classes of persons mentioned in the criminal statute. Accordingly, § 28-1413 does not create or confer an affirmative right to use physical or corporal punishment, but, rather, the statute only provides a defense against criminal liability. Section 28-1413 extends the defense to a "parent or guardian" when the parent or guardian is caring for or supervising a minor; nevertheless, parents do not derive their authority or affirmative right to discipline their children from this criminal defense statutory provision.

Similarly, § 43-708 cannot be interpreted as preventing DSS from regulating the disciplinary methods imposed upon children in child-caring agencies. Section 43-708 limits DSS' power to enter the home of a parent who retains the custody of a child, or the person standing in loco parentis to the child. This statute restricts DSS from forcibly removing a child from the parent, guardian, or person standing in loco parentis prior to any departmental or court-authorized intervention. Section

43-708 does not supply insulation from DSS' regulatory authority when agencies receive children from the State, parents, or courts. This interpretation is consistent with the other statutory provisions in chapter 43, article 7. For example, Neb. Rev. Stat. § 43-701 (Reissue 1984) authorizes DSS to license child-caring agencies; thus, DSS "may grant or revoke such a license and make all needful rules regarding the issuance or revocation thereof." Neb. Rev. Stat. § 43-705 (Reissue 1984), moreover, provides that DSS may visit any child placed in a child-caring agency in order to ascertain whether a child is being properly cared for and living under moral surroundings. Beyond this statutory power, Neb. Rev. Stat. § 43-706 (Reissue 1984) establishes DSS' statutory authority to file a complaint in the proper juvenile court when DSS has reason to believe that any person having the care or custody of a child is an "improper person for such care or custody, or subjects such child to cruel treatment, or neglect, or immoral surroundings . . . ." Finally, Neb. Rev. Stat. § 43-707 (Reissue 1984) provides in part:

> The Department of Social Services shall have power and it shall be its duty (1) *to promote the enforcement of all laws for the protection and welfare of defective, illegitimate, dependent, neglected, and delinquent children*, except laws whose administration is expressly vested in some other state department or division hereof and to take the initiative in all matters involving such children where adequate provision therefor has not already been made; (2) *to visit and inspect all public and private institutions, agencies, societies, or persons caring for, receiving, placing out, or handling children* . . . .

(Emphasis supplied.)

When §§ 43-707 and 43-708 are read together, the limiting language contained in § 43-708 pertains only to a private, family home where a parent or other person with custody of a child retains custody of the child. Consequently, when the child is placed with an agency, society, institution, or other person, DSS is authorized to oversee and regulate those agencies which place or care for these children. DSS' regulatory authority is triggered when the children are placed with the agencies which care for, receive, place out, or handle children. Section 43-708

merely reaffirms the parent or guardian's right to determine the treatment and correction of the child, or the agency to be employed for treatment and correction, prior to a possible placement by a State agency or the courts. We conclude, therefore, that the language contained in § 43-708 does not preclude DSS from enacting or enforcing a regulation prohibiting the use of physical punishment in child-caring facilities.

In light of our interpretation of §§ 28-1413 and 43-708, we cannot conclude that these statutes codify a public policy prohibiting DSS from promulgating a regulation which prohibits physical punishment in licensed child-caring facilities.

In *United Seeds, Inc. v. Hoyt*, 168 Neb. 527, 96 N.W.2d 404 (1959), this court was confronted with a problem in determining the State's public policy in connection with a statute relating to labeling on containers of agricultural seed sold in Nebraska. United Seeds sought a declaration that Hoyt, as director of the Department of Agriculture and Inspection of the State of Nebraska, did not have the power to prohibit United Seeds' use of labels containing the following language: " 'UNITED SEEDS, INC., warrants to the extent of the purchase price that seeds or bulbs sold are as described on the container within recognized tolerances. Seller gives no other or further warranty, expressed or implied' . . . ." *Id*. at 528, 96 N.W.2d at 405. The agriculture director claimed that his authority to restrict or prohibit seed container labels was founded on Nebraska's public policy expressed in "The Nebraska Seed Law," which provided:

> "The name and address of the person who labeled said seed or who sells, offers or exposes said seed for sale within this state. No tag or label shall be affixed to any package or container of agricultural seed or mixture thereof, unless the same has been approved by the Department of Agriculture and Inspection."

*Id*. at 529, 96 N.W.2d at 406.

Holding that the agriculture director did not have the authority claimed by public policy, this court, in *United Seeds, Inc. v. Hoyt, supra*, stated:

> Public policy has been defined in varying terms but a

definition which has been accepted in numerous jurisdictions is as follows: "That principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good. * * * The principles under which the freedom of contract or private dealings is restricted by law for the good of the community." Black's Law Dictionary (3d Ed.), p. 1374.

It may be said with certainty that the act contains no specific declaration of public policy in this connection. Does it by reasonable inference or implication contain such a declaration? We think not.

. . . There is nothing in the act or its title which specifically gives or purports to give the department any control over or voice in the rights and liabilities between a seller and purchaser of seed. Likewise there is nothing which either by inference or implication gives the department any such control. It is therefore impossible to find a source from which it could be said that there was a declaration of public policy which would permit or require the defendants to reject the declaration of limited warranty which plaintiff intended to place upon its tags or labels.

*Id.* at 531, 96 N.W.2d at 407.

In the present case, we find that §§ 28-1413 and 43-708 do not provide any expressed legislative indication of any public policy prohibiting DSS from regulating the use of corporal punishment in licensed child-caring facilities.

Citing *Clasen v. Pruhs*, 69 Neb. 278, 95 N.W. 640 (1903), and *Fisher v. State*, 154 Neb. 166, 47 N.W.2d 349 (1951), the district court in this case further determined that this State's public policy is reflected in the common law of Nebraska. Reliance upon those cases, however, is misplaced. *Clasen v. Pruhs, supra,* involved a suit to recover damages for the inhumane and cruel treatment suffered by a minor while in the care and custody of the minor's maternal aunt. The plaintiff alleged that she was subjected to cruel and unnecessary torture, beatings, and whippings, and improperly clothed and fed while under her aunt's care and custody. As a result, the plaintiff maintained

that she suffered permanent injuries to her health and growth. The sole issue focused upon whether or not the plaintiff was subjected to inhumane and brutal treatment in excess of the authority properly reposed in the aunt during the time the plaintiff's aunt stood in loco parentis to the child. In *Clasen* we applied the rule that "[a] parent, teacher or master is not liable either civilly or criminally for moderately correcting a child, pupil or apprentice, but it is otherwise if the correction is immoderate and unreasonable." 69 Neb. at 283, 95 N.W. at 642. Nevertheless, *Clasen* does not stand for the proposition that a teacher, master, or child-caring agency has the affirmative right to administer reasonable corporal punishment. Indeed, the rule found in *Clasen v. Pruhs, supra*, is a restatement of the common-law rule that was later codified in the criminal defense provision of § 28-1413 of the Nebraska Revised Statutes.

Similarly, *Fisher v. State, supra*, was a criminal action in which the defendant had struck and whipped a child with a wooden ruler and stick, causing the child's death. In *Fisher*, this court repeated the rule that a parent, or one standing in the relation of a parent, is not liable either civilly or criminally for moderate and reasonable corporal punishment. *Fisher v. State*, however, does not support the proposition that one standing in the relation of a parent has the affirmative right to use physical punishment upon a child. These cases are limited to factual situations involving criminal and civil liability for the excessive use of physical punishment, abuse, or neglect of a child. Thus, *Clasen v. Pruhs, supra*, and *Fisher v. State, supra*, fail to support the view that the common law of Nebraska supports a clear public policy providing those who stand in the relation of a parent with the affirmative right to inflict physical punishment upon children.

We are unable to conclude that public policy in Nebraska prohibits DSS from enacting a regulation proscribing the use of physical punishment in licensed child-caring facilities. Therefore, we must conclude that the district court erred in determining that the public policy of Nebraska provides an affirmative right to a licensed child-caring facility to inflict corporal punishment.

DSS further maintains that the district court erred in holding

that persons who stand in loco parentis have the right to use reasonable corporal punishment, thus allowing parents to delegate to third parties the authority to administer corporal punishment. The district court determined that those parents who have placed their children in the Cornhusker child-caring agency specifically authorized Cornhusker to administer reasonable corporal punishment. Proceeding from this factual finding, the district court determined that the houseparents and superintendent of Cornhusker stand in loco parentis to a child in the care of the Cornhusker home because the home has placed itself in the situation of a lawful parent in accordance with the principles delineated in *Austin v. Austin*, 147 Neb. 109, 22 N.W.2d 560 (1946). Citing to § 43-708, the district court concluded that Cornhusker's in loco parentis status provided it with the authority to use reasonable corporal punishment for discipline and control.

As we stated previously, § 43-708 does not provide an agency standing in loco parentis with an affirmative right to inflict corporal punishment upon children residing in licensed child-caring facilities. Section 43-708 simply limits DSS' power to forcibly remove a child from the home of his parents or guardian, or one standing in loco parentis, prior to State intervention into the parent-child relationship. Therefore, § 43-708 cannot reasonably be interpreted as providing the child-caring agency with the affirmative right to inflict corporal punishment upon children residing in the agency. In *Austin v. Austin, supra* at 112-13, 22 N.W.2d at 563, we defined the in loco parentis relationship:

> "A person standing in loco parentis to a child is one who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption, and the rights, duties, and liabilities of such person are the same as those of the lawful parent. . . ."

Although Cornhusker may stand in loco parentis to the children at the child-caring facility, the State has a legitimate interest in the proper care and protection of children within its jurisdiction. As we stated in *State v. Duran*, 204 Neb. 546, 554, 283 N.W.2d 382, 387 (1979):

> The parents' natural and superior rights to have custody of their children have always been protected and maintained by the courts, but those rights are not absolute or inalienable, as society also has a paramount interest in the protection of the right of children to be loved, cared for properly, and to have proper moral training and education.

Hence, the State's parens patriae power obligates it to protect the welfare and interests of the child. See, *Gorsuch v. Gorsuch*, 148 Neb. 122, 26 N.W.2d 598 (1947) (quoting 39 Am. Jur. *Parent and Child* § 15 (1942)); *State, ex rel. Bize, v. Young*, 121 Neb. 619, 237 N.W. 677 (1931).

The foregoing propositions of law demonstrate that even the parents' natural right to the care and custody of a child is limited by the state's power to protect the health and safety of children. Consequently, an agency standing in loco parentis to a parent is similarly limited by the State's parens patriae power to protect the best interests and welfare of children within its jurisdiction.

In *State ex rel. O'Sullivan v. Heart Ministries, Inc.*, 227 Kan. 244, 607 P.2d 1102 (1980), operators of a Christian children's home challenged the validity of certain state regulations and licensing requirements, contending that compliance with these regulations violated the home's rights under the "free exercise clause" in the first amendment to the U.S. Constitution. Among these regulations, the nonprofit Christian children's home objected to a regulation prohibiting the use of corporal punishment or other "[d]iscipline which is humiliating, frightening, or physically harmful." *Id*. at 249, 607 P.2d at 1106. However, the Kansas Supreme Court stated:

> The statutes and regulations to which the defendants object are all designed to protect, in one way or another, the children who are cared for in homes other than those provided by their parents. The licensing and inspection, as well as the myriad regulations, are concerned with the care and well being of the children—their shelter, health, diet, safety, education, and general welfare are of prime concern.

*Id*. at 253, 607 P.2d at 1108-09. Moreover, even though the

children's home in *O'Sullivan, supra,* asserted a fundamental right in the first amendment context, the Kansas Supreme Court held that the balance weighed heavily in favor of the State's power to protect children within its jurisdiction, stating that "[t]he compelling interest of the State, as *parens patriae,* is the protection of its children from hunger, cold, cruelty, neglect, degradation, and inhumanity in all its forms. To fulfill this responsibility, the legislature has elected to impose licensing and inspection requirements." *Id.* at 257, 607 P.2d at 1112.

*Johnson v. Cal. State Dept. of Soc. Services,* 123 Cal. App. 3d 878, 177 Cal. Rptr. 49 (1981), involved operators of a private day-care and preschool center who challenged a California Department of Social Services regulation prohibiting corporal punishment and other humiliating or frightening techniques. To obtain a license under California law, the plaintiffs were required by the Department of Social Services to state in writing that they would refrain from corporal punishment, including spanking, and would delete all references to spanking from the advertising and admission agreements.

In *Johnson,* the court stated that the plaintiffs were challenging a policy decision by the department to prohibit corporal punishment in licensed day-care centers. The plaintiffs alleged that the corporal punishment regulation violated the equal protection clause of the 14th amendment to the U.S. Constitution by establishing a suspect classification because parents of children similarly situated were subject to disparate treatment. In addition, the plaintiffs alleged that the regulation affected fundamental rights of parenting and that no compelling state interests were served by the regulation. Rejecting the plaintiffs' constitutional contentions, the court expressed:

> [W]e are here concerned with the delegation by the parents to third parties, and particularly state licensed care facilities, of the rights of discipline by corporal punishment. *We have been cited to no case which holds a State may not by regulation prohibit parents from either allowing or requiring others to administer corporal punishment to their children.* Parenting as a fundamental right is personal in nature. When parents delegate to third

parties those decisions regarding child rearing, care, discipline and education, such delegation does not carry with it the constitutional protections inherent in the right of the parents. Moreover, *this parental duty and right is tempered by and subject to limitations. When parental decisions may jeopardize the health or safety of a child, the state may assert important interests in safeguarding that health and safety.*

(Emphasis supplied.) 123 Cal. App. 3d at 886, 177 Cal. Rptr. at 53 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)).

The preceding decisions from Kansas and California demonstrate that a parent has a personal right to determine the appropriate discipline to be inflicted upon the child, but the State has a paramount interest in protecting the health and welfare of a child from parental discipline decisions which may cause the child emotional or physical harm. With great emphasis, courts have described the State's interest as a compelling interest in the health and safety of children within the State's jurisdiction. See, *State ex rel. O'Sullivan v. Heart Ministries, Inc.*, 227 Kan. 244, 607 P.2d 1102 (1980); *Johnson v. Cal. State Dept. of Soc. Services, supra; DSS v Emmanuel Baptist*, 150 Mich. App. 254, 388 N.W.2d 326 (1986) (a regulation prohibiting corporal punishment reflected state's compelling interest in protecting young children from physical harm). In the case before us, the district court erred in concluding that child-caring agencies, by standing in loco parentis to a parent, have the right to use reasonable corporal punishment for discipline and control. DSS' regulation prohibiting corporal punishment is a proper expression of the State's parens patriae power to set standards for the care and protection of children within Nebraska. Our determination, however, should not be construed as deprecating the parents' personal right to use reasonable corporal punishment when disciplining their children.

Next, DSS contends that the district court erred in holding that the regulation prohibiting corporal punishment in licensed child-caring facilities exceeds the scope of DSS' rulemaking authority. The district court concluded that DSS' power is

limited to protecting children from unreasonable corporal punishment and does not extend to matters involving corporal punishment which is otherwise reasonable. DSS argues that § 71-1904 provides the legislative authority for Regulation 6-005.26K prohibiting physical punishment in licensed child-caring facilities. Section 71-1904 provides:

> The department shall make such rules and regulations, consistent with sections 71-1901 to 71-1905, as it shall deem necessary for (1) the proper care and protection of children by licensees under said sections, (2) the issuance, suspension and revocation of licenses to carry on the business of child care, and (3) the proper administration of said sections.

Cornhusker does not assert, nor did the district court hold, that § 71-1904 is an unconstitutional delegation of legislative authority to DSS. The sole question, therefore, is whether or not DSS exceeded its rulemaking authority in promulgating the corporal punishment regulation.

The Legislature can delegate to an administrative agency the power to make rules and regulations to implement the policy of a statute. *County of Dodge v. Department of Health*, 218 Neb. 346, 355 N.W.2d 775 (1984). Nevertheless, the administrative agency's rulemaking authority is limited to the powers delegated to the agency by the statute which the agency is to administer. *County of Dodge v. Department of Health, supra; State ex rel. Marsh v. Nebraska St. Bd. of Agr.*, 217 Neb. 622, 350 N.W.2d 535 (1984); *Lincoln Electric System v. Terpsma*, 207 Neb. 289, 298 N.W.2d 366 (1980). An administrative agency's rulemaking authority is essential to the agency's exercise of its power in efforts to achieve a purpose intended by the Legislature. Therefore, the courts are not inclined to interfere with rules established by legislative direction when the rules bear a reasonable relation to the subject of the legislation and constitute a reasonable exercise of the powers conferred. *Lincoln Dairy Co. v. Finigan*, 170 Neb. 777, 104 N.W.2d 227 (1960); *Board of Regents v. County of Lancaster*, 154 Neb. 398, 48 N.W.2d 221 (1951). Although an administrative agency's rulemaking authority is limited to the powers delegated by the express statutory provisions, "It is almost impossible for a

legislature to prescribe all the rules and regulations necessary for a specialized agency to accomplish the legislative purpose." *School Dist. No. 8 v. State Board of Education*, 176 Neb. 722, 726, 127 N.W.2d 458, 461 (1964). In *Motors Acceptance Corp. v. McLain*, 154 Neb. 354, 358, 47 N.W.2d 919, 921-22 (1951), we stated:

> "It is not always necessary that statutes and ordinances prescribe a specific rule of action. This is particularly true in those situations where it is difficult or impracticable to declare a definite, comprehensive rule, or where the discretion to be exercised by an administrative officer relates to a regulation imposed for the protection of public morals, health, safety, and general welfare. . . ."

The validity of an administrative agency's rule or regulation is contingent upon consistency with the statute under which the rule or regulation is promulgated. *County of Dodge v. Department of Health, supra*. Referring to § 71-1904, we note that the Legislature has authorized DSS to make such rules and regulations "as it shall deem necessary for . . . the proper care and protection of children." The corporal punishment regulation falls under the purview of this general standard providing DSS with the authority to determine the necessary regulations for proper care and protection of children within Nebraska. DSS' disciplinary standard has a direct relationship to the concepts of both child-care and child protection. In each case, DSS has made a determination concerning a specific type of care and protection which, in the present case, relates to corporal punishment. DSS has not used its rulemaking power to modify, alter, or enlarge provisions of the statute which it is charged with administering. *County of Dodge v. Department of Health, supra*. Moreover, as we stated in *Motors Acceptance Corp. v. McLain, supra*, an administrative agency will have considerable discretion when its regulation relates to the protection of public morals, health, safety, and general welfare.

DSS admitted that Regulation 6-005.26K was not promulgated in response to any specific incident of child abuse at a child-caring facility. However, DSS periodically reviews regulations pertaining to child-caring facilities, and the corporal punishment regulation was promulgated in an effort

to protect children from physical or psychological harm. Although Cornhusker asserts that it has the right to inflict "reasonable" physical punishment in licensed child-caring facilities, nevertheless, we agree with DSS that a "reasonableness" determination would be ad hoc in nature and would only come after a child has already been psychologically or physically harmed. In light of these facts, we hold that Regulation 6-005.26K properly comes within DSS' rulemaking authority to promulgate rules for the proper care and protection of children in licensed child-caring facilities.

DSS' final assignment of error asserts that the district court erred in holding that DSS' distinction between the use of corporal punishment in child-caring facilities and family day-care homes is arbitrary and capricious. The district court concluded that the reason for applying reasonable corporal punishment in family day-care homes similarly and equally applied to infliction of corporal punishment in the Cornhusker home, since houseparents at Cornhusker administered the punishment, and if unreasonable force were being used, that fact would more than likely be reported to a higher authority by the other children at Cornhusker home. DSS, however, contends that there is a clear rationale behind DSS' distinction in the disciplinary standards applied in the different facilities.

As pointed out by DSS' witness Debra Dawson, children in licensed child-caring facilities, like children in foster care, often come from abusive families, while children in family day-care centers are visited by their parents at the facility at least twice a day. A major distinction between these two types of facilities is that children in family day-care homes are generally within the custody of their own parents, while children in licensed child-caring facilities are, generally, placed there by courts and DSS. Children in family day-care homes, like children in foster homes, are faced with less severe problems than are children who are placed in the more institutional and restrictive environment of a child-caring agency. Therefore, child-caring agencies are more restrictive and offer a more structured environment than a family day-care home. In summary, unlike parents in child-caring facilities, parents of children in family day-care homes are actively involved in the upbringing of their

children and maintain close contact with the child-care provider.

In *Ingraham v. Wright*, 430 U.S. 651, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977), the U.S. Supreme Court analyzed the "openness" of the public school environment in holding that the use of corporal punishment in public schools did not constitute cruel and unusual punishment in violation of the eighth amendment:

> Though attendance may not always be voluntary, the public school remains an open institution. Except perhaps when very young, the child is not physically restrained from leaving school during school hours; and at the end of the school day, the child is invariably free to return home. *Even while at school, the child brings with him the support of family and friends and is rarely apart from teachers and other pupils who may witness and protest any instances of mistreatment.*
>
> *The openness of the public school and its supervision by the community afford significant safeguards against the kinds of abuses from which the Eighth Amendment protects the prisoner.*

(Emphasis supplied.) 430 U.S. at 670.

DSS contends that, unlike public schools, 24-hour child-caring facilities are not open institutions. Evidence presented in this case concerning the restrictive and more institutionalized environment of the child-caring facility buttresses DSS' contention. Indeed, assuming that the majority of the children have been placed in the child-caring agency by the courts or DSS, as are two-thirds of the children in Cornhusker home, then the children do not have the support of their parents to intervene when the children may be mistreated. Moreover, child-caring agencies are not accountable to the same extent as are public schools. Finally, unlike family day-care home providers, who are often visited by the children's parents as frequently as twice a day, operators of 24-hour-a-day child-caring facilities are not accountable to the children's parents. The record does not support the district court's conclusion that a mistreated child would likely report an incident of mistreatment to a higher authority in Cornhusker

home.

DSS' special concern pertaining to corporal punishment inflicted upon children in licensed child-caring facilities reflects the State's legitimate right and duty to protect and nurture its minor children. See *Prince v. Massachusetts*, 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944). As the Texas Supreme Court expressed in *State v. Corpus Christi People's Baptist*, 683 S.W.2d 692, 696 (Tex. 1984):

> The State must be especially concerned with the welfare of children residing in child-care facilities. The parents of these children are absent. The children who reside in these homes are entirely dependent upon the operators and employees for their food, shelter and care. Communication with those outside the facility is wholly controlled by the institution. The staff at the homes exercise total supervision over the children's health, safety and well-being. They direct even the smallest details of the children's daily lives.

In *State v. Corpus Christi People's Baptist, supra*, the court held that the State has a compelling interest of the highest order in protecting children in child-care facilities from physical and mental harm and that this compelling interest outweighed the burden imposed by the church's duty to comply with licensing requirements.

Realizing that the State of Nebraska has a compelling interest in the care and protection of children in licensed child-caring facilities, we cannot conclude that DSS' proscription of physical punishment upon children in these child-caring agencies is arbitrary and capricious. DSS has demonstrated that a justifiable reason exists for the difference in treatment between children residing in licensed child-caring facilities and children in the care of providers in family day-care homes. See, also, *Johnson v. Cal. State Dept. of Soc. Services*, 123 Cal. App. 3d 878, 177 Cal. Rptr. 49 (1981) (upholding a Department of Social Services regulation prohibiting corporal punishment in licensed day-care centers, and emphasizing the differences between licensed day-care centers and public schools); *Kate' School v. Department of Health*, 94 Cal. App. 3d 606, 156 Cal. Rptr. 529 (1979) (prohibiting corporal punishment in

community care facilities for mentally disabled children).

We conclude that DSS' regulation, codified in Neb. Admin. Code tit. 474, ch. 6, § 6-005.26K (1983), and prohibiting corporal or physical punishment, is a proper expression of the State's parens patriae power to set standards for the care and protection of children within the State of Nebraska. Therefore, we reverse the judgment entered by the district court in these proceedings.

REVERSED.