STATE OF NEBRASKA, APPELLEE, v. CHRISTOPHER D. ANDERSON, APPELLANT.

605 N.W.2d 124

Filed January 21, 2000. No. S-99-259.

Michael J. Hansen, of Berry, Kelley & Hansen, for appellant.

Don Stenberg, Attorney General, and Mark D. Raffety for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.
## NATURE OF CASE
Appellant Christopher D. Anderson was convicted of possession of a controlled substance, i.e., marijuana, with intent to distribute, pursuant to Neb. Rev. Stat. § 28-416(1)(a) (Reissue 1995). Prior to trial, Anderson filed a motion to suppress the marijuana seized from his vehicle at the time of his arrest, alleging his rights were violated because he was unreasonably detained. The district court for Hamilton County, Nebraska, overruled Anderson's motion to suppress, from which he now appeals. On our own motion, we removed the matter to this court under our authority to regulate the caseloads of this court and the Nebraska Court of Appeals. We reverse the judgment and remand the cause for a new trial.

## BACKGROUND
On August 27, 1997, Anderson was driving a white Dodge Intrepid eastbound on Interstate 80, near the Giltner interchange in Hamilton County, Nebraska. Anderson was stopped by Trooper Christopher M. Kolb of the Nebraska State Patrol and issued a violation card for failing to display a front and rear license plate on the vehicle he was driving. Anderson was then asked if he had any drugs or guns in the vehicle, and he responded that he did not. Kolb then asked Anderson for consent to search the vehicle, and Anderson refused. Anderson was then detained, and his vehicle was reviewed by a canine unit of the State Patrol. Upon the canine's alerting to the presence of drugs, Anderson's vehicle was searched and 229½ pounds of marijuana were found in the trunk. Anderson was arrested.

Anderson was charged with possession of a controlled substance, i.e., marijuana, with intent to deliver, pursuant to § 28-416(1)(a), and possession of marijuana without a tax stamp, pursuant to Neb. Rev. Stat. § 77-4309 (Reissue 1996). Prior to trial, Anderson filed a motion seeking to suppress at the trial any and all items of evidence seized from his person and from his vehicle at the time of his arrest. Anderson's motion to suppress alleged that the stop, detention, seizure, and search of his vehicle, and the subsequent arrest of Anderson violated his right to be free from unreasonable searches and seizures as guaranteed to him by the 4th and 14th Amendments to the U.S. Constitution and by article I, § 7, of the Nebraska Constitution.

On June 11, 1998, a suppression hearing was held. The State first called Kolb. Kolb testified that he is employed as a sergeant assigned to road operations with the State Patrol, has been employed with the State Patrol for over 15 years, and has been a sergeant since November 1992. On the date Anderson was stopped, Kolb was working traffic patrol on Interstate 80.

Kolb testified that just before stopping Anderson, Kolb's vehicle was east of the Giltner interchange on Interstate 80, sitting on the median as Kolb observed traffic. Kolb saw a white car traveling eastbound on the Interstate and noticed that the car did not have a front license plate. When the car went by Kolb's location, Kolb thought he saw an Ohio license plate on the rear of the car. Kolb pulled into traffic and proceeded east on the Interstate to catch up with the car and confirm that the car had an Ohio license plate. Once Kolb confirmed that the car did have an Ohio license plate, he stopped the car for failing to display two license plates. Kolb testified he was familiar with the fact that Ohio requires two license plates to be displayed, one on the front and one on the rear of the car.

Once the car pulled over, Kolb contacted the driver, who was Anderson, and asked him for his driver's license and vehicle registration. Kolb testified that he initially noted that he could see Anderson's carotid artery pulse beating through the skin of his neck. Kolb testified that he could not recall ever before seeing someone's pulse beating in their neck to the degree Anderson's was. In response to Kolb's request for Anderson's driver's license and registration, Anderson first produced a

driver's license from Ohio. As Anderson searched for the vehicle registration, Kolb testified that Anderson's hands were visibly shaking and that initially an insurance card was produced by Anderson and handed to Kolb. Kolb testified that he had seen Anderson thumb past the registration initially while Anderson was looking through several papers. Kolb gave the insurance card back to Anderson and again requested the vehicle registration. Anderson went through the papers that he had in his hands again. Anderson again passed over the registration while looking through the papers. Kolb testified that Anderson's hands were still visibly shaking and that eventually Kolb pointed out the registration to Anderson.

Kolb noted that both the license and registration had the name "Christopher Anderson" on them, and Kolb then began to tell Anderson why he had been stopped. During this conversation, Kolb asked Anderson where he was coming from. Kolb testified that Anderson hesitated for several seconds and then said that he had stayed all night in North Platte. Kolb then asked Anderson where he had initiated his trip, not where he had stayed the night before. Anderson responded that he had initiated his trip in Albuquerque, New Mexico. Anderson went on to indicate that he had visited a sister there and had stayed about 2 days. Kolb testified that based on his experience, he found it odd that Anderson hesitated before answering the initial question and found it unusual that Anderson answered the initial question with where he had spent the previous night rather than from where his trip had initiated.

Kolb testified that he next told Anderson to remain seated in his car. Kolb then went back to his patrol car and filled out a violation card and also ran a driver's license status check and a criminal history check. Kolb testified that these were normal activities performed during a traffic stop. The check revealed that the driver's license was valid and that Anderson had no criminal history. Kolb then returned to Anderson's vehicle, gave Anderson back his driver's license and registration, and explained the violation card to him and had him sign it.

Kolb testified that when he returned to Anderson's car, he could still see the pulsing in Anderson's neck. He also observed Anderson's hands continue to shake, and Anderson continued to

be nervous, even after it was explained to him that he was being given only a violation card. A violation card carries no penalty, but requires the driver of the vehicle to correct the defect that the trooper has marked on the card. Kolb testified that in his experience, normally when a driver receives a violation card instead of a citation, it usually has a "calming effect" on the driver once the driver understands it is not a citation.

After Anderson signed the violation card, Kolb gave him a copy and told Anderson that he was not under arrest or in custody. Kolb then asked Anderson if he was carrying any illegal drugs or guns, specifically naming off marijuana, cocaine, and methamphetamine. Anderson indicated "no" to each drug that was named by Kolb. Kolb testified that at this point, Anderson would not look at him and stared straight ahead, not making eye contact with Kolb. Before Kolb had mentioned narcotics, Anderson had maintained eye contact with Kolb.

Kolb testified that he next asked Anderson for permission to search his person, his vehicle, and the vehicle's contents. Anderson initially asked whether the search would be limited to the backseat area of the car, and Kolb clarified that he was asking permission to search Anderson's person, as well as the entire vehicle and its contents. Anderson then refused to consent to a search of his vehicle. Kolb testified that during this exchange, Anderson exhibited the same nervous tendencies that Kolb had initially observed.

Kolb informed Anderson that based upon his observations and the conversation the two had had, Kolb was going to call a canine unit to walk around the exterior of Anderson's vehicle. Kolb also told Anderson to remain in his car while Kolb called the canine unit. Anderson remained in his vehicle while waiting for the canine unit to arrive. Trooper Greg Goltz arrived at the location with the narcotics canine within a few minutes of being called. Just before Goltz arrived, Trooper George Scott also arrived at the location.

Goltz also testified at the suppression hearing on behalf of the State. Goltz testified that when he arrived at the location where Kolb had stopped Anderson, he first spoke with Kolb about the situation. Goltz then asked Anderson, who was still seated in his

vehicle, to roll up the windows and step out of the vehicle. Goltz testified that he walked the canine around Anderson's vehicle, starting at the front of the vehicle and proceeding around to the driver's side. When Goltz and the canine reached the driver's side back door, the canine started to alert to the odor of a controlled substance, and when the canine got to the trunk of the vehicle, the canine aggressively alerted. Goltz then asked Anderson if he was responsible for everything in the vehicle, and Anderson responded that he was. Goltz then obtained the key to the trunk from Anderson and opened it, finding four duffelbags containing large cellophane-wrapped bundles of marijuana. Goltz testified that Anderson was then placed under arrest.

The trial court overruled Anderson's motion to suppress, finding that in consideration of all the circumstances that had occurred, Kolb had a reasonable and articulable suspicion that Anderson was engaged in criminal behavior.

Anderson waived a jury trial, and the case was tried as a stipulated bench trial that preserved Anderson's objections to the seized evidence for purposes of appeal. Anderson was convicted of possession of a controlled substance with intent to distribute. The other charge, possession of marijuana without a tax stamp, was dismissed by the State. Anderson was subsequently sentenced to a term of imprisonment of not less than 18 months nor more than 3 years. Anderson timely appealed.

## STANDARD OF REVIEW

When reviewing a district court's determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search, ultimate determinations of reasonable suspicion and probable cause are reviewed de novo and findings of fact are reviewed for clear error, giving due weight to inferences drawn from those facts by the trial judge. *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996).

## ASSIGNMENT OF ERROR

Anderson assigns that the trial court erred when it overruled his motion to suppress, finding that his detention was based on a reasonable suspicion of criminal activity.

## ANALYSIS

Anderson does not challenge the validity of the initial traffic stop. "It is well established that a traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle." *State v. Bartholomew, ante* p. 174, 179, 602 N.W.2d 510, 514 (1999). Accord, *U.S. v. Beck*, 140 F.3d 1129 (8th Cir. 1998); *U.S. v. Barry*, 98 F.3d 373 (8th Cir. 1996), *cert. denied* 519 U.S. 1140, 117 S. Ct. 1014, 136 L. Ed. 2d 891 (1997); and *U.S. v. Barahona*, 990 F.2d 412 (8th Cir. 1993). Kolb's observation of Anderson's vehicle having only one Ohio license plate, rather than two, provided probable cause for Kolb to stop Anderson's vehicle. There is no dispute that the initial stop of Anderson's vehicle was lawful.

Anderson argues that the troopers were not justified in continuing to detain him after the initial traffic stop was complete. Anderson alleges that detaining him after he had received the violation card and had refused to consent to a search of his vehicle constituted an unreasonable detention because Kolb did not have reasonable suspicion that Anderson was engaged in criminal activity.

When Kolb stopped Anderson, he was entitled to conduct an investigation " 'reasonably related in scope to the circumstances that justified the interference in the first place.' " *U.S. v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (quoting *U.S. v. Cummins*, 920 F.2d 498 (8th Cir. 1990)). A reasonable investigation of a traffic stop may include asking for a driver's license and registration, requesting a driver to sit in the patrol car, and asking the driver about his or her destination and purpose. *U.S. v. White*, 81 F.3d 775 (8th Cir. 1996); *U.S. v. Ramos*, 42 F.3d 1160 (8th Cir. 1994); *U.S. v. Bloomfield, supra.* A law enforcement officer may also run a computer check to establish whether the vehicle has been stolen and to ascertain whether there are outstanding arrest warrants for the occupants of the car. *U.S. v. White, supra.* See, also, *State v. Holman*, 221 Neb. 730, 380 N.W.2d 304 (1986).

After Kolb stopped Anderson, he asked Anderson for his driver's license and vehicle registration and also asked where Anderson was coming from. He also conducted a check on Anderson's driver's license as well as a criminal history check.

After running the checks, Kolb gave Anderson his driver's license and registration back and gave him the violation card. These actions were reasonable for a traffic stop. At this point, the purpose of the initial traffic stop was complete. There was no unreasonable detention prior to Kolb's issuance of the violation card to Anderson.

The reasonable scope of the initial traffic stop ended when Anderson refused to consent to a search of his vehicle. Anderson contends that after this point in time, he was unreasonably detained.

We must initially determine whether detaining Anderson after the completion of a valid stop for a traffic violation, in order to await a drug dog sniff of his vehicle, constitutes a seizure under the Fourth Amendment. If such actions do give rise to a seizure within the Fourth Amendment, we must also determine whether Kolb possessed a reasonable suspicion to further detain Anderson after the completion of the traffic stop.

If there is no detention or seizure within the meaning of the Fourth Amendment to the U.S. Constitution, then the Fourth Amendment safeguard against an unreasonable seizure is not implicated in an encounter between a private citizen and a police officer. *State v. Soukharith*, 253 Neb. 310, 570 N.W.2d 344 (1997); *State v. Twohig*, 238 Neb. 92, 469 N.W.2d 344 (1991). A seizure in the Fourth Amendment context occurs " 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *State v. Twohig*, 238 Neb. at 102, 469 N.W.2d at 351 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988)). It is axiomatic that without a seizure, reasonable suspicion is not required. *State v. Soukharith, supra.*

A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area, even if the officer has no reason to suspect the individual is involved in criminal activity, provided the officer does not indicate that compliance with his or her request is required. *U.S. v. Beck*, 140 F.3d 1129 (8th Cir. 1998); *U.S. v. White, supra.* Circumstances indicative of a seizure may include " 'the threatening presence of several officers, the display of a weapon by an officer, some physical touch-

ing of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' " *U.S. v. Galvan-Muro*, 141 F.3d 904, 906 (8th Cir. 1998) (quoting *U.S. v. White*, 81 F.3d 775 (8th Cir. 1996), and *United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), *rehearing denied* 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed. 2d 1138)).

Once Kolb gave Anderson the violation card and returned Anderson's driver's license and registration, Anderson had everything in his possession that he needed to continue his trip. The question becomes whether a reasonable person who is initially stopped for a traffic violation and is then asked by a State Patrol trooper for consent to search his or her vehicle and refuses to consent to the search would have felt free to leave. We do not believe that a reasonable person in Anderson's situation would have felt free to leave.

In addition, Kolb admitted at the suppression hearing that Anderson was not free to leave. The following exchange occurred at the suppression hearing between Anderson's counsel and Kolb:

Q Was it then — I'm going to go back to the traffic stop — then was it then [after Kolb had explained the violation ticket] that you told him that he wasn't under arrest or in custody?

A Yeah, after I gave him the card and explained it to him, then I told him that he wasn't under arrest or in custody.

Q Was he free to leave at that point?

A I would have asked him to remain, based upon my observations, but I had a conversation with him after that, after I told him that he wasn't under arrest or in custody. So he knew, you know, where he stood, that he wasn't under arrest or in custody.

Q My question was, was he free to leave at that point?

A I would have detained him at that point.

Q So the answer is, no, he wasn't free to leave?

THE COURT: Isn't that what you're saying, Sergeant?

A Yeah, I would have detained him based upon what I knew at that point.

THE COURT: Answer is no.

Therefore, Anderson was seized within the Fourth Amendment after the traffic stop was complete. The search that followed was permissible only if Kolb had a reasonable suspicion that Anderson was involved in criminal activity unrelated to the traffic violation.

An officer must have a reasonable, articulable suspicion that a person is involved in criminal activity unrelated to the traffic violation before the officer may expand the scope of the traffic stop and continue to detain the person for additional investigation. *U.S. v. Carrate*, 122 F.3d 666 (8th Cir. 1997). Therefore, unless Kolb had a reasonable, articulable suspicion for believing that criminal activity was afoot, continued detention of Anderson became unreasonable after Kolb had finished processing Anderson's traffic violation. See *U.S. v. Beck*, 140 F.3d 1129 (8th Cir. 1998).

> " ' "[P]olice can constitutionally stop and briefly detain a person for investigative purposes if the police have a reasonable suspicion, supported by articulable facts, that criminal activity exists, even if probable cause is lacking under the fourth amendment." ' ". . .
> " ' "Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized suspicion or 'hunch,' but less than the level of suspicion required for probable cause.". . .' "

(Citations omitted.) *State v. Soukharith*, 253 Neb. 310, 321, 570 N.W.2d 344, 354 (1997) (quoting *State v. Bowers*, 250 Neb. 151, 548 N.W.2d 725 (1996), and *State v. Childs*, 242 Neb. 426, 495 N.W.2d 475 (1993)). Whether a police officer has a reasonable suspicion based on sufficient articulable facts requires taking into account the totality of the circumstances. *State v. Soukharith, supra*; *State v. Ellington*, 242 Neb. 554, 495 N.W.2d 915 (1993).

In *U.S. v. Beck, supra*, an Arkansas police officer observed Beck in a green Buick with California license plates following another vehicle too closely. The officer pulled the vehicle over and asked Beck for his driver's license and rental car agreement. While talking to Beck, the officer noticed that Beck's hands were shaking and he was looking around. The officer also

observed fast-food trash on the front passenger floor and also noted that there was not any luggage in the vehicle's passenger compartment. Following a check of the driver's license and rental car agreement, both of which checked out, the officer gave Beck a verbal warning for following too closely and then told Beck he was free to go. The officer then asked Beck if he had any guns, drugs, or knives in his vehicle. Beck stared out the window and said no. The officer then asked if he could conduct a quick search. The officer indicated that at this point, Beck became more nervous and asked for the reason for the search. Beck refused the request to search. A K-9 officer was radioed, and when the officer and his drug dog arrived, the dog alerted at the rear door. Beck was then asked if he had anything illegal in the car, and he said yes and indicated a briefcase, a search of which revealed methamphetamines. The trial court denied Beck's motion to suppress. The U.S. Court of Appeals for the Eighth Circuit held that the fact that the Buick was coming from California, a purported " 'source state' " for drugs, *id.* at 1137, was an extremely weak factor to suspect criminal activity, given that out-of-state license plates are consistent with innocent behavior and not probative of reasonable suspicion. The court of appeals noted that innumerable other Americans travel to and from California for pleasure or lawful business. The court of appeals also held that mere presence of fast-food wrappers is entirely consistent with innocent travel such that in the absence of contradictory information, that factor cannot reasonably be said to give rise to suspicion of criminal activity. The court of appeals held that the lack of luggage in the passenger compartment fails to generate any suspicion of criminal activity because law enforcement agencies, as a crime prevention tip, advise not to leave luggage in view. The court of appeals also held that subjective assessment of nervousness cannot be deemed unusual for a motorist to exhibit when confronted by a law enforcement officer and concluded that the suspicion associated with Beck's nervous demeanor was, at best, minimal. The court of appeals noted that nervousness, as a basis for reasonable suspicion, must be treated with caution. The court of appeals also held that the fact that Beck, a truckdriver, would travel across the United States to obtain employment is not suspicious behavior.

In *U.S. v. Kirkpatrick*, 5 F. Supp. 2d 1045 (D. Neb. 1998), a Nebraska state trooper observed Kirkpatrick in a vehicle on Interstate 80 going 72 miles per hour in a 65-mile-per-hour zone. The trooper pulled the vehicle over and asked Kirkpatrick for his driver's license and rental car agreement. The rental car agreement showed that the vehicle had been rented in Las Vegas, Nevada, on November 9, 1997, and was due in Minneapolis on November 12. The trooper explained the reason for the stop, and then asked Kirkpatrick where he was coming from. Kirkpatrick replied that he was coming from Las Vegas and going to Minneapolis. Kirkpatrick explained that he had flown to Las Vegas to pick up his niece, as her mother did not want her to fly, and drove his niece from Las Vegas to Denver. A check of Kirkpatrick's license showed no problems. The trooper then asked if Kirkpatrick had any guns or drugs in the car, and Kirkpatrick said no. One of the trooper's suspicions was based on the fact that Kirkpatrick kept touching his nose. The trooper radioed for a drug dog and while waiting for the dog and his handler to arrive, he asked Kirkpatrick for permission to search the vehicle, which was refused. The opinion is silent as to whether when the dog arrived it alerted. The two troopers searched Kirkpatrick's vehicle and found a handgun, police scanner, and a duffelbag of $20 bills. The government contended the trooper involved in the initial stop had an "articulable suspicion" based on " 'particularized facts.' " *Id.* at 1050. The U.S. District Court found:

> Even a cursory comparison of the facts of this case and the facts of *Beck* show that the facts of this case are even weaker than the facts found insufficient in *Beck*. The "source" and "destination" facts are too inclusive to raise an objective suspicion; that is, many perfectly law-abiding citizens drive from the Southwest to Minneapolis. The fact that the defendant was driving a rental car is also perfectly consistent with law-abiding activity. In fact, the name match between the driver's license and the rental car agreement and the match between the rental agreement (the place of rental and return) and the defendant's story dispels, rather than creates, suspicion. Still further, and contrary to the officer's suggestion, there was nothing odd

about the defendant's explanation of his trip. Uncles very frequently help their nieces just like (as in *Beck*) some truck drivers from California rent cars to look for work in North Carolina. Also, the duration of the trip—four days— in relationship to the reason for the trip was not suspicious. Finally, the act of touching one's nose, and the like, hardly suggests criminal behavior.

*Id.* at 1050.

The Eighth Circuit Court of Appeals has summarized the standards used to consider whether reasonable suspicion exists as follows:

"The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of 'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed.' . . . In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. '[T]he totality of the circumstances—the whole picture—must be taken into account.' . . . We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. . . . It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt; . . . however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a 'hunch' or on circumstances which 'describe a very broad category of predominately innocent travelers.' "

(Citations omitted.) *U.S. v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998).

In this case, prior to the request by Kolb to search the vehicle and the refusal by Anderson, Kolb noticed that Anderson's carotid artery was pulsing, his hands were visibly shaking, and he had difficulty locating his registration. Kolb found that Anderson's initial response to the question "[w]here are you

coming from?" was evasive. The only action of Anderson that was different after the request for a search and the refusal of such request was that Anderson no longer maintained eye contact with Kolb as he had prior to the request for a search.

Trembling hands, a pulsing carotid artery, difficulty locating a vehicle registration among documents in a glove box, and hesitancy to make eye contact are signs of nervousness which may be displayed by innocent travelers who are stopped and confronted by an officer. Standing alone, these observations did not afford Kolb a basis for believing that Anderson was involved in criminal activity. See, *U.S. v. Beck, supra*; *U.S. v. Kirkpatrick*, 5 F. Supp. 2d 1045 (D. Neb. 1998). Likewise, Anderson's hesitation before responding to Kolb's inquiry as to where he was coming from cannot be viewed as indicative of criminal behavior, in that the question is not specific as to whether Kolb was inquiring about the starting point of the trip or about the place from which Anderson had departed that day. Anderson's actions during the stop, as described by Kolb, did not afford a basis for a reasonable suspicion of criminal activity, but, rather, supported nothing more than a "hunch." The fact that the hunch proved to be correct does not legitimize the seizure and subsequent search. Based on the evidence in this record, we determine that Kolb did not have a reasonable suspicion of criminal activity to justify detaining Anderson after the traffic stop was complete and that Anderson's motion to suppress should therefore have been sustained.

 Upon finding error in a criminal trial, the reviewing court must determine whether the evidence presented by the State was sufficient to sustain the conviction before the cause is remanded for a new trial. In *Lockhart v. Nelson*, 488 U.S. 33, 109 S. Ct. 285, 102 L. Ed. 2d 265 (1988), the Court held that the Double Jeopardy Clause does not forbid a retrial so long as the sum of the evidence offered by a state and admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict. See, also, *State v. Palmer*, 257 Neb. 702, 600 N.W.2d 756 (1999).

██ Pursuant to *Lockhart v. Nelson, supra*, when considering the sufficiency of the evidence in determining whether to remand for a new trial or to dismiss, an appellate court must

consider all the evidence presented by the State and admitted by the trial court irrespective of the correctness of that admission. To the extent that *State v. Christner*, 251 Neb. 549, 557 N.W.2d 707 (1997); *State v. Emrich*, 251 Neb. 540, 557 N.W.2d 674 (1997); *State v. Janssen*, 7 Neb. App. 384, 584 N.W.2d 27 (1998); *State v. Mays*, 6 Neb. App. 855, 578 N.W.2d 453 (1998); *State v. Konfrst*, 4 Neb. App. 517, 546 N.W.2d 67 (1996), *reversed on other grounds* 251 Neb. 214, 556 N.W.2d 250; *State v. Jimenez*, 3 Neb. App. 421, 530 N.W.2d 257 (1995), *modified* 248 Neb. 255, 533 N.W.2d 913; *State v. Noll*, 3 Neb. App. 410, 527 N.W.2d 644 (1995); and *State v. Poppe*, No. A-96-402, 1997 WL 52896 (Neb. App. Feb. 4, 1997) (not designated for permanent publication), are inconsistent with this opinion, they are overruled.

In the present case, the evidence against Anderson was the marijuana found in Anderson's vehicle. Although we have concluded that the marijuana was erroneously admitted, we include such evidence in our determination of the sufficiency of the evidence. See *Lockhart v. Nelson, supra*. We conclude the marijuana was sufficient evidence to sustain Anderson's conviction for possession of a controlled substance with intent to distribute. Thus, Anderson is not entitled to dismissal of the charges against him. We reverse Anderson's conviction, vacate the sentence, and remand the cause for a new trial.

## CONCLUSION

The officer who stopped Anderson for failing to display two Ohio license plates did not have reasonable suspicion to detain Anderson after the traffic stop was complete. Therefore, the continued detention and seizure of Anderson violated his rights under the 4th and 14th Amendments to the U.S. Constitution and article I, § 7, of the Nebraska Constitution. Anderson's motion to suppress should have been sustained.

REVERSED, SENTENCE VACATED, AND
CAUSE REMANDED FOR A NEW TRIAL.