STATE OF NEBRASKA, APPELLEE, V.
JOHN K. NGUTH, APPELLANT.
701 N.W.2d 852

Filed August 16, 2005. No. A-04-1037.

Jerry J. Fogarty, Deputy Hall County Public Defender, for appellant.

Jon Bruning, Attorney General, and Kevin J. Slimp for appellee.

IRWIN, SIEVERS, and CASSEL, Judges.

SIEVERS, Judge.

John K. Nguth appeals the decision of the district court for Hall County convicting him of child abuse, a Class IIIA felony, and sentencing him to 9 months in the Hall County jail.

FACTUAL AND PROCEDURAL BACKGROUND

The Hall County Attorney filed an information against Nguth on March 12, 2004, charging him with Class IIIA felony child abuse in violation of Neb. Rev. Stat. § 28-707(1)(b) (Cum. Supp. 2004). The information alleged that on or about February 2, Nguth "knowingly and intentionally caused or permitted a minor child to be cruelly confined or cruelly punished; to-wit: G.K.K., DOB: 11-19-1992." An amended information alleging the same was filed on May 27, 2004. Jury selection was held on July 1, and the jury trial began on July 6.

At the outset of the trial, G.K.K. was qualified as a witness by the trial court through its questioning of G.K.K. about the importance of truth telling. G.K.K. testified that in February 2004, he lived with Nguth, Nguth's wife, and their four sons. G.K.K. testified that Nguth and his wife are not G.K.K.'s parents but that they told people they were his parents. G.K.K. testified that he participated in a basketball program at the elementary school he attended, although he did not tell Nguth or his wife about G.K.K.'s participation in the program. G.K.K. testified that the program's final basketball game was at the senior high school and that G.K.K.'s physical education teacher picked him up at 5 p.m. to take him to the game.

G.K.K. testified that when the physical education teacher took G.K.K. home at 9:40 p.m., Nguth was upset but did not say anything. G.K.K. testified that he changed his clothes and then went to the living room, where Nguth was, and that Nguth started asking G.K.K. questions about whether it was G.K.K.'s choice to go to the senior high school without telling Nguth. G.K.K. testified that he told Nguth he was sorry and that when G.K.K. would not say anything, Nguth

> would start to get angrier, then he got up and took out the cord and then I got a little scared and I sat on the couch and then — then he told me to keep talking and I keep [sic] talking, talking and then — then I was keep [sic] telling him that I was sorry, and then he just started hitting me.

G.K.K. described the cord as a white electrical cord with the plug missing. G.K.K. said that the cord was attached to what looked like a candle with a bulb on top and that the candle would light up when the cord was plugged in. G.K.K. testified that Nguth got the cord off the top of the television and hit G.K.K. 15 to 20 times with the cord, hitting him on his face, hands, back, and legs. G.K.K. testified that the cord Nguth used to hit G.K.K. was not found.

G.K.K. testified that he lied to the school nurse about how he got his injuries because he was scared but that the truth is Nguth hit him. G.K.K. testified that his friend told him that " 'we have to tell the teacher because that happened to me once and my dad almost killed me but he doesn't do that anymore.' " G.K.K. testified that his classroom teacher saw his face and sent him to the

principal's office, where G.K.K. talked to the principal and the police. G.K.K. testified that after talking to the police, he had to go to the hospital, and that Nguth's wife went with him. G.K.K. testified that by the way she looked, he could tell she was upset, and that she was upset because Nguth had been arrested.

G.K.K.'s physical education teacher testified that he picked G.K.K. up from his home at 6 p.m. and took him to the final basketball game. The teacher said that he returned G.K.K. to his home at 9 p.m. and that the teacher could tell Nguth was upset by his facial expressions and his tone of voice. The teacher testified that he saw G.K.K. at school the next day and that G.K.K. had a swollen eye, a line down his face, and puffy lips. The teacher also testified that G.K.K. was sad, upset, and afraid.

The elementary school staff nurse testified that early on the morning of February 3, 2004, G.K.K.'s teacher sent him to the nurse's office because G.K.K. was not feeling well. The school nurse testified that she observed G.K.K. at that time and that he had injuries which required first aid treatment. She described those injuries as follows:

[G.K.K.] had a vertical one-half inch scabbed laceration between his left eyebrow and his upper left eyelid; he had two vertical lacerations side-by-side, one was half inch and the other was an inch laceration just below the left eye; his left eye was swollen; there was a two-inch vertical scabbed laceration just below the left eye extending along his left nose down to the upper lip; his upper lip was swollen; he had dark drainage, moist drainage in the outer canal of his left ear, and his left eye pupil was slow to respond to light.

The school nurse testified that she estimated the injuries were incurred within the previous 12 to 24 hours. She testified that G.K.K. told her he ran into a door, but that upon further questioning, G.K.K. said he had been struck by Nguth with a type of belt. The school nurse testified that the police and the "EMS team" arrived and took G.K.K. to the hospital.

An emergency room doctor at the hospital testified that he treated G.K.K. on February 3, 2004. The doctor testified that G.K.K. had a linear abrasion on his face which would be consistent with the report that he had been struck by a rope or cord. The doctor also testified that it is possible G.K.K. could have

been struck more than once, although a hospital nurse's notes say that G.K.K. was struck one time. When pressed on cross-examination, the doctor testified that G.K.K. could "possibly" have received his injuries by falling off a bed. However, the doctor testified generally that falling leaves bruising and being struck leaves marks and abrasions like G.K.K. had.

A Grand Island police officer testified that on February 3, 2004, she went to the elementary school in response to a possible child abuse case. The officer testified that she spoke to G.K.K. and observed "two marks on the left side of his face, swollen eye and a swollen upper lip and it looked like there was some dried blood in his left ear." The officer testified that she was present when the pictures of G.K.K.'s injuries were taken—such pictures were admitted into evidence at trial. The officer testified that she went to G.K.K.'s house and spoke with Nguth. The officer testified that Nguth admitted to being upset with G.K.K. because of the basketball incident and that Nguth asked her, " 'Why can't you just take the kid?' " The officer testified that at that time, she looked for the weapon described by G.K.K. and found on top of an entertainment center a "triangle electrical item, silver and gold and it had a white extension cord." However, the officer testified that she later showed the item to G.K.K. and that he indicated it was not the item Nguth used to hit him.

Three witnesses testified for the defense: Nguth's son B.K., Nguth, and the police officer. After being qualified by the court, B.K., who was 12 years old, testified that on the night of February 2, 2004, he saw a bump on G.K.K.'s head, and that G.K.K. told B.K. that G.K.K. had fallen off the bunk bed. (The police officer testified that B.K. had also told her that G.K.K. fell off the bed.) B.K. testified that on February 2, G.K.K. never told him to tell Nguth that G.K.K. went to play basketball. B.K. also testified that he never told G.K.K. to lie or to tell people that G.K.K. fell out of the bed.

Nguth testified, through an interpreter, that G.K.K. had lived with him since Nguth came to the United States from Africa. Nguth testified that on February 2, 2004, he was worried because he did not know where G.K.K. was—he was worried because children can get "lost" in this country. He testified that G.K.K. came home around 10 p.m., after being missing for 4 to 5 hours.

Nguth testified, "I was not in position to punish [G.K.K.] but I was in position to tell him what he did is wrong." Nguth testified that he told G.K.K. to go to his room and do his assignment, that G.K.K. slipped as he was climbing into bed, and that Nguth saw a bruise on G.K.K.'s eye but did not think it was a "big" injury. Nguth testified that he took G.K.K. to school the next day and that after a while, the police came to Nguth's house. Nguth testified that he told the police that G.K.K. had slipped while climbing into bed. (The record indicates that in Nguth's conversation with the police, a neighbor may have translated for Nguth.)

The jury found Nguth guilty of child abuse as charged. A sentencing hearing was held on August 24, 2004, and the court's journal entry was filed on the same day. The district court found that Nguth was not a fit and proper candidate for probation and sentenced him to 9 months in the Hall County jail, with a credit of 8 days for time served. Nguth now appeals.

## ASSIGNMENTS OF ERROR

Nguth alleges that the district court erred in (1) overruling his request for a jury instruction on justification of parental discipline and his request that negligent child abuse be instructed as a lesser-included offense, (2) finding the evidence sufficient to convict him of felony child abuse, and (3) imposing an excessive sentence.

## STANDARD OF REVIEW

Whether jury instructions given by a trial court are correct is a question of law. *State v. Wright*, 261 Neb. 277, 622 N.W.2d 676 (2001). In an appeal based on a claim of erroneous jury instructions, the appellant has the burden to show that the questioned instructions were prejudicial or otherwise adversely affected a substantial right of the appellant. *Id.*

In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. McPherson*, 266 Neb. 734, 668 N.W.2d 504 (2003).

## ANALYSIS

*Jury Instructions.*

At common law, a parent, or one standing in the relation of parent, was not liable either civilly or criminally for moderately and reasonably correcting a child, but it was otherwise if the correction was immoderate and unreasonable. *Clasen v. Pruhs*, 69 Neb. 278, 95 N.W. 640 (1903). It is a question of fact to be determined by the jury whether or not the punishment inflicted was, under all the circumstances and surroundings, reasonable or excessive. *Id.* In 1972, the common-law rule was codified as Neb. Rev. Stat. § 28-1413 (Reissue 1995). In *Cornhusker Christian Ch. Home v. Dept. of Soc. Servs.*, 227 Neb. 94, 106, 416 N.W.2d 551, 560 (1987), the court stated that "the rule found in *Clasen v. Pruhs, supra*, is a restatement of the common-law rule that was later codified in the criminal defense provision of § 28-1413 of the Nebraska Revised Statutes."

■ Nguth alleges that the district court erred in overruling his request for a jury instruction on justification of parental discipline based on § 28-1413, which provides in part:

The use of force upon or toward the person of another is justifiable if:

(1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor or a person acting at the request of such parent, guardian, or other responsible person and:

(a) Such force is used for the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of his or her misconduct; and

(b) Such force used is not designed to cause or known to create a substantial risk of causing death, serious bodily harm, disfigurement, extreme pain or mental distress, or gross degradation.

■ The trial court denied Nguth's request for a jury instruction on justification of parental discipline, reasoning that there was no evidence to support such an instruction because Nguth consistently denied the allegations and stated, "I was not in position to punish [G.K.K.] but I was in position to tell him what he did is wrong." However, the standard for whether an instruction is proper is not determined only by the defendant's evidence or

theory of the case. The law is that if there is any evidence to support the giving of the instruction, it must be given. For example, it has been held that a trial court must instruct the jury on the issue of self-defense when there is any evidence adduced which raises a legally cognizable claim of self-defense. See *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997). There is abundant evidence from G.K.K. that Nguth was angry with G.K.K. and punishing him for attending the basketball game without permission or notification and that the injuries at issue occurred as a result. Additionally, the evidence was that G.K.K. lived with Nguth and his family since Nguth came to the United States from Africa and that G.K.K.'s parents were in Sudan. The statute does not require a formal guardianship; rather, § 28-1413 includes "other person similarly responsible for the general care and supervision of a minor," which language clearly describes the evidence of the relationship between G.K.K. and Nguth.

■ The two most significant cases involving § 28-1413 are *State v. Beins*, 235 Neb. 648, 456 N.W.2d 759 (1990), and *State v. Miner*, 216 Neb. 309, 343 N.W.2d 899 (1984). In *Miner, supra*, the defendant was convicted of manslaughter in connection with the death of his girl friend's 3-year-old son who died as the result of a kick to his epigastric region. The defendant waived a jury, and after his conviction, he argued on appeal that his act was privileged under the provisions of § 28-1413. The Supreme Court in *Miner, supra*, assumed that the defendant had standing to invoke the statute and held that whether the act committed by the defendant was privileged, or whether it constituted an assault and was therefore unlawful, presented a question of fact which was resolved against the defendant. In *Beins, supra*, the defendant was convicted of third degree assault for hitting and choking his 15-year-old daughter. The defendant argued on appeal that his actions toward his daughter were privileged under § 28-1413. However the *Beins* court quickly disposed of the argument by noting that an instruction posing such defense under the statute was given to the jury, which apparently resolved such issue against the defendant. Finally, we note that the Supreme Court discussed § 28-1413 in *Cornhusker Christian Ch. Home v. Dept. of Soc. Servs.*, 227 Neb. 94, 102, 416 N.W.2d 551, 558 (1987), as follows:

[Section] 28-1413 does not create or confer an affirmative right to use physical or corporal punishment, but, rather, the statute only provides a defense against criminal liability. Section 28-1413 extends the defense to a "parent or guardian" when the parent or guardian is caring for or supervising a minor.

Here, an instruction utilizing § 28-1413 was not given, as it was in *Beins*, although there was a request for such an instruction. In *Miner* and *Beins*, the defendants admitted the conduct at issue but claimed the statutory defense, whereas in the instant case, Nguth denies striking G.K.K. in the course of disciplining him and claims that G.K.K.'s injuries resulted from a fall while getting into bed. Nonetheless, we have rejected the lower court's finding that Nguth's denial precluded the instruction because G.K.K.'s testimony provided the evidence that the injuries were inflicted via discipline.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997); *Kent v. Crocker*, 252 Neb. 462, 562 N.W.2d 833 (1997). See *State v. Glantz*, 251 Neb. 947, 560 N.W.2d 783 (1997). The defense in § 28-1413 applies only when "[s]uch force used is not designed to cause or known to create a substantial risk of causing death, serious bodily harm, disfigurement, extreme pain or mental distress, or gross degradation." Clearly, this portion of the statute implicates the intent of the actor. A commonly used and approved jury instruction provides that intent is a mental process, which generally remains hidden within the mind where it is conceived, and that such intent is rarely if ever susceptible of proof by direct evidence, although it may be inferred from the words and acts of the defendant and from the facts and circumstances surrounding his conduct. See *State ex rel. NSBA v. Veith*, 238 Neb. 239, 470 N.W.2d 549 (1991). Whether a defendant possesses the requisite state of mind is a question of fact and may be proved by circumstantial evidence. See *State v. Meyer*, 236 Neb. 253, 460 N.W.2d 656 (1990).

In determining whether the evidence required that the justification defense be submitted to the jury, we note that there was evidence of a parental or guardianship type of relationship plus evidence of punishment of G.K.K. by Nguth. Additionally, the evidence of the injuries sustained is not such that we could say as a matter of law that the force used was designed to cause, or known to create, a substantial risk of causing death, serious bodily harm, disfigurement, extreme pain or mental distress, or gross degradation. Thus, the key fact question, if the jury rejects Nguth's denial and accepts G.K.K.'s version, is still the intent of Nguth. In other words, when hitting G.K.K. with the cord, did Nguth intend to cause, or did he know, that such actions created a substantial risk of causing death, serious bodily harm, disfigurement, extreme pain or mental distress, or gross degradation. Included in our consideration of this issue is evidence that G.K.K. was struck only once. The police officer testified that G.K.K. told her that he was struck with the cord "once," and the emergency room doctor admitted that the written emergency room record stated, " 'Struck him one time with electric cord.' " Clearly, how a fact finder would view the parental justification defense is dependent, at least in part, on the number of times G.K.K. was struck. And there is widely varying evidence on this point. The trial court erred in failing to instruct the jury on the parental justification defense set forth in § 28-1413, and such failure was obviously prejudicial to Nguth.

*Lesser-Included Offense.*

Nguth also alleges that the district court erred in overruling his request that negligent child abuse be instructed as a lesser-included offense, and we take up this issue because it is likely to recur upon our remand.

> [A] court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense.

*State v. Williams*, 243 Neb. 959, 965, 503 N.W.2d 561, 566 (1993). Accord *State v. Weaver*, 267 Neb. 826, 677 N.W.2d 502 (2004).

If the first prong of the *Williams* test is not satisfied, it is unnecessary to analyze the second prong. . . . When applying *Williams*, a court is to look initially not to the evidence, but to the statutory elements of the crimes at issue. . . . The process is a comparison of criminal statutes to determine if it is impossible to commit the greater offense without at the same time committing the lesser offense.

(Citations omitted.) *State v. McKimmey*, 10 Neb. App. 595, 599, 634 N.W.2d 817, 821 (2001).

The Nebraska Supreme Court has held that misdemeanor child abuse is a lesser-included offense of felony child abuse under § 28-707. See *State v. Parks*, 253 Neb. 939, 573 N.W.2d 453 (1998). The *Parks* court reasoned: "The proscribed conduct for each offense is exactly the same; it is the actor's state of mind which differentiates the offenses. If the abuse is committed knowingly and intentionally, it is a felony; if committed negligently, it is a misdemeanor. [O]ne state of mind can be included within another." *Id.* at 947, 573 N.W.2d at 459. Because the "elements" prong of the *Williams* test has been satisfied, we move on to the second prong of the test.

We turn to whether the evidence produces a rational basis for acquitting Nguth of the greater offense and convicting him of the lesser offense. In *State v. Schwartz*, 219 Neb. 833, 838, 366 N.W.2d 766, 770 (1985), the court discussed whether a lesser-included instruction was required and stated:

[I]f there is evidence in some form (whether it be evidence offered by defendant, evidence developed in cross-examination of the State's witnesses, or evidence adduced from other witnesses) before the jury, which directly disputes the additional element differentiating the same conduct as to degree, an instruction on the lesser-included offense is proper.

"The intent with which an act is committed may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident." *State v. Parks*, 253 Neb. at 949, 573 N.W.2d at 460. The evidence reflects that Nguth was angry because G.K.K. did not tell Nguth that G.K.K. was going to play basketball and because Nguth did not know where G.K.K. was. G.K.K. testified that Nguth hit G.K.K. 15 to 20 times with a

cord, hitting him on his face, hands, back, and legs. The emergency room doctor testified that G.K.K. had a linear abrasion on his face which would be consistent with the report that he had been struck by a rope or cord. However, as recounted earlier, there was evidence that G.K.K. was struck only once, from which evidence a fact finder could reasonably conclude that the injuries inflicted were the result of negligence, not intentionally cruel punishment as charged. Thus, while we recognize that Nguth denies striking G.K.K. at all, we consider all the evidence regardless of source, and when G.K.K.'s statements to the police officer and emergency room personnel are put into the mix, there is a rational basis for a fact finder to conclude that negligence was at work, rather than intentional cruel punishment. While in *Parks, supra*, the defendant's testimony indicated, in effect, that the child was injured by him, but that the act was not done in anger or as punishment because the fracture of the leg occurred accidentally when the defendant repositioned the child to change his diaper, the evidence of negligence here comes from the victim. But, that does not change the outcome, because the jury could believe that Nguth struck G.K.K., but only once, and that thus, the punishment was negligent abuse, not intentionally cruel abuse. Therefore, the trial court was required to instruct the jury on the lesser-included offense of negligent child abuse.

*Sufficiency of Evidence.*

 Nguth alleges that the evidence presented at trial was insufficient to convict him of felony child abuse. We address this assignment only in the context of whether Nguth may be retried after our reversal. See *State v. Noll*, 3 Neb. App. 410, 527 N.W.2d 644 (1995), *overruled on other grounds, State v. Anderson*, 258 Neb. 627, 605 N.W.2d 124 (2000) (if defendant appeals conviction and obtains reversal based on trial error, Double Jeopardy Clause does not forbid retrial so long as sum of evidence offered by State and admitted by trial court, whether erroneously or not, would have been sufficient to sustain guilty verdict).

The evidence offered by the State included testimony from G.K.K. that Nguth hit G.K.K. 15 to 20 times with a cord, hitting him on his face, hands, back, and legs. G.K.K. described the cord as a white electrical cord with the plug missing. The

emergency room doctor testified that G.K.K. had a linear abrasion on his face which would be consistent with the report that he had been struck by a rope or cord. Clearly, there was sufficient evidence to support Nguth's conviction, and as a result, he may be retried.

## CONCLUSION

Because the evidence was sufficient to sustain the conviction but there was trial error in failing to properly instruct the jury, we reverse the conviction and sentence and remand the cause for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.