IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. BRYNER


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

CURTIS J. BRYNER, APPELLANT.


Filed October 25, 2016.    No. A-15-1193.


Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

F. Matthew Aerni, of Berry Law Firm, for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.


MOORE, Chief Judge, and PIRTLE, Judge, and MCCORMACK, Retired Justice.

MOORE, Chief Judge.

## INTRODUCTION

Curtis J. Bryner appeals from his conviction in the district court for Lancaster County for possession of marijuana with intent to deliver. Bryner asserts that the district court erred in finding that he was not unreasonably seized following the traffic stop and in failing to suppress the evidence obtained subsequent to the traffic stop. Because we find no error by the district court, we affirm.

## BACKGROUND

Following a traffic stop on January 9, 2015, during which marijuana was discovered in Bryner's vehicle, a complaint was filed charging Bryner with possession of marijuana with intent to deliver, a Class III felony pursuant to Neb. Rev. Stat. § 28-416(1),(2)(b) (Cum. Supp. 2014). See, also Neb. Rev. Stat. § 28-405 (Cum. Supp. 2014). Class III felonies were punishable at the

- 1 -

time of the offense by up to 20 years' imprisonment, a $25,000 fine, or both, with a minimum penalty of 1 year imprisonment. Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2014).

Bryner filed a motion to suppress all evidence obtained after the conclusion of the January 9 traffic stop. On May 19, 2015, a hearing was held on the motion to suppress. The State offered into evidence the video recording of the traffic stop and subsequent events. Testimony was given by two law enforcement officers and Bryner. The following evidence was adduced at the suppression hearing.

TRAFFIC STOP

During the morning of January 9, 2015, Deputy Jason Mayo of the Lancaster County Sheriff's Office, while stationed in his police cruiser along the interstate, observed a red Nissan being driven in excess of the speed limit. After visually estimating the vehicle to be speeding, Mayo pulled behind the vehicle and obtained two speed readings, the first at 75 m.p.h. and the second at 70 m.p.h. The vehicle was traveling through a 55 m.p.h. construction zone.

Mayo activated the cruiser's lights and pulled the vehicle over. During this time, Mayo also called Deputy Henkel, a police canine handler, who arrived at the scene shortly thereafter. Mayo contacted Henkel because both deputies worked together on the interstate and sometimes call upon each other during traffic stops.

The traffic stop was recorded by an in-car video camera contained within Mayo's cruiser, with audio supplied through microphones worn on Mayo's person and located within the cruiser. Mayo approached the vehicle and made contact with the driver, Bryner. Mayo requested that Bryner accompany him back to the police cruiser to fill out paperwork pertaining to the traffic violation. Bryner sat in the front seat of the cruiser.

While in the cruiser, Mayo ran a check on Bryner's license, checked for any outstanding warrants, made small talk with Bryner regarding the weather, and asked several questions concerning his trip over the next couple of minutes. Also during this time, Henkel arrived at the scene, checked something on the vehicle, spoke to Mayo, and returned to his police cruiser.

During this conversation, Bryner provided various information to Mayo. Bryner stated that he lived in Happy Camp, California. Mayo noted in his subsequent investigation report that this region of California is known for growth and trafficking of high grade marijuana. Mayo asked Bryner what the closest large city was to his residence, to which he replied Medford, Oregon. Mayo reported recognizing this area from prior policing experience as a location where marijuana is commonly produced and trafficked.

Bryner told Mayo he was employed as an in-home caregiver for two individuals in California. He claimed to be traveling on a 2-week vacation to Chicago, Illinois and Oklahoma City, Oklahoma to visit family.

Mayo observed that the vehicle was a rental, and had a "lived in look" based on the presence of food wrappers. The vehicle appeared to contain only a single backpack, with no other luggage visible. Mayo determined during the stop that the vehicle was only being rented for one week. Mayo later testified that rental cars are often used to transport drugs.

Mayo left his cruiser and checked something on the vehicle, spoke with Henkel, then returned to the cruiser. Upon returning to the cruiser, Mayo spoke with Bryner regarding speed

limits between Lincoln and Omaha, issued a warning to Bryner, then discussed various aspects of the warning. Mayo concluded the traffic stop by asking Bryner if he had any questions about the warning, and then handing him the paperwork. Mayo did not expressly inform Bryner that he was free to leave at this time.

### REQUEST TO REMAIN AND ANSWER
### ADDITIONAL QUESTIONS

Immediately after giving Bryner the warning, Mayo asked Bryner if he would be willing to answer a few additional questions. Specifically, Mayo asked Bryner, "before you roll out can I ask you a couple really quick questions real fast before you go?" Mayo stated that Bryner had "been more than decent" with him, and asked if Bryner would be "cool with that." Bryner replied by stating "yeah." Mayo expressed to Bryner that he has the opportunity to speak with all kinds of people, and that very rarely are they involved in something illegal. However, Mayo explained that he has to ask, as it is his job.

First, Mayo asked if Bryner was transporting any large amounts of cocaine, methamphetamine, or heroin, which Bryner denied. Next, Mayo asked if Bryner was transporting large amounts of marijuana. Mayo claims that Bryner "paused and almost choked" before saying no. Mayo then asked if Bryner had any large amounts of money. Bryner replied that he just had a debit card and laughed.

### REQUESTS TO CONDUCT VEHICLE SEARCH
### AND POLICE CANINE SNIFF

Following this line of questioning, Mayo told Bryner he appreciated his time, then requested consent from Bryner to do a quick search of the vehicle for any of the aforementioned items. Bryner replied that Mayo did not need to search the vehicle.

Mayo asked Bryner if he was responsible for everything in the vehicle. Bryner replied "yeah my bags." Mayo had previously noticed three fingermarks on the trunk of the vehicle, which appeared fresh when compared to the dirt on the vehicle. Based on this observation, Mayo asked if Bryner had been in the trunk, mentioning the finger marks, which Bryner denied. Bryner stated that the marks were not his. Mayo then clarified that Bryner did not want him to search the vehicle, which Bryner confirmed. Mayo noted in his subsequent report that Bryner was "extremely nervous and shaking" while Mayo spoke to him about the contents of the vehicle.

Following these denials by Bryner of consent to search the vehicle, Mayo asked Bryner if he would be opposed to having a trained police canine walk around the exterior of the vehicle, mentioning that the canine detects the odor of narcotics. Bryner consented, stating that "[Mayo] could do that." Henkel proceeded to walk the police dog around the vehicle. On the third lap around the vehicle, the dog alerted to the presence of narcotics in the trunk. Henkel informed Bryner that the canine indicated there was an odor of narcotics coming from the trunk, and Bryner admitted there was marijuana in the trunk. Henkel and Mayo then searched the vehicle, locating 19 heat-sealed baggies of marijuana in the trunk, totaling to approximately 22 pounds.

Mayo testified that if Bryner had declined to stay and speak further after the traffic stop had concluded, he would have let him leave. However, after learning additional information during

this post-stop conversation with Bryner, if Bryner had not consented to the police canine sniff, Mayo would have detained him because he was suspicious that Bryner was involved in criminal activity and believed that he had reasonable suspicion at this time to detain him. Bryner testified that he did not feel free to leave after Mayo gave him the warning and began to ask additional questions, or at any other point during his contact with Mayo.

On September 8, 2015, the district court issued an order overruling the motion to suppress. The court found that Bryner consented to additional questioning by Mayo after the traffic stop concluded and consented to the police canine sniff and therefore Bryner was not unreasonably seized.

On October 21, 2015, a stipulated bench trial was held. The State offered into evidence the traffic stop video, Mayo's supplementary investigation report, and a lab report confirming that the substance located in the vehicle was marijuana. Bryner objected to the admission of this evidence on the same basis presented within his earlier motion to suppress. The district court overruled these objections and received these exhibits into evidence. At the conclusion of this hearing, Bryner was found guilty of the charged offense beyond a reasonable doubt. On December 17, 2015, Bryner was sentenced to imprisonment for a period of 1 to 2 years.

Bryner subsequently perfected this appeal.

## ASSIGNMENTS OF ERROR

Bryner assigns, restated, that the district court erred in finding that he was not unreasonably seized when (1) Mayo requested Bryner remain and answer additional questions after the traffic stop was completed, and (2) Mayo requested to conduct a police canine sniff after Bryner denied consent to search his vehicle.

## STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Tyler*, 291 Neb. 920, 870 N.W.2d 119 (2015).

Likewise, we apply the same two-part analysis when reviewing whether a consent to search was voluntary. As to the historical facts or circumstances leading up to a consent to search, an appellate court reviews the trial court's findings for clear error. However, whether those facts or circumstances constituted a voluntary consent to search, satisfying the Fourth Amendment, is a question of law, which an appellate court reviews independently of the trial court. *Id.*

## ANALYSIS

The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government. *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011). It is well settled under the Fourth Amendment that warrantless searches and seizures are per se unreasonable, subject to a few

specifically established and well-delineated exceptions. *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001).

A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010). In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Hedgcock,* 277 Neb. 805, 765 N.W.2d 469 (2009).

It is a longstanding principle of law in Nebraska that police-citizen encounters involving no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen elicited through noncoercive questioning, do not rise to the level of a seizure. *In re Clinton G.*, 12 Neb. App. 178, 669 N.W.2d 467 (2003) (citing *State v. Burdette*, 259 Neb. 679, 611 N.W.2d 615 (2000)). Stated another way, a seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area, even if the officer has no reason to suspect the individual is involved in criminal activity, provided the officer does not indicate that compliance with his or her request is required. *State v. Anderson*, 258 Neb. 627, 605 N.W.2d 124 (2000), *overruled on other grounds*. See, also, *State v. Hedgcock*, *supra*.

The right to be free from unreasonable searches and seizures may be waived by consent of the citizen. *State v. Reinpold*, 284 Neb. 950, 824 N.W.2d 713 (2013). In order for a consent to search to be effective, it must be a free and unconstrained choice and not the product of a will overborne. *State v. Magallanes*, 284 Neb. 871, 824 N.W.2d 696 (2012). Consent must be given voluntarily and not as the result of duress or coercion, whether express, implied, physical, or psychological. *State v. Canbaz*, 270 Neb. 559, 705 N.W.2d 221 (2005). Mere submission to authority is insufficient to establish consent to a search. *Tucker, supra*.

The Fourth Amendment does not require that a lawfully seized defendant be advised that he or she is legally "free to go" before the defendant's consent to search will be recognized as voluntary. *State v. Dallmann*, 260 Neb. 937, 621 N.W.2d 86 (2000). An officer need not give any warning to a citizen that he or she may freely refuse a request to search. *Id.*

The determination of whether consent to search is voluntarily given is a question of fact to be determined from the totality of the circumstances. *State v. Turner*, 23 Neb. App. 897, 880 N.W.2d 403 (2016) (citing *State v. Ready*, 252 Neb. 816, 565 N.W.2d 728 (1997)). The burden is upon the government to prove that a consent to search was voluntarily given. *Turner, supra*. (citing *State v. Prahin*, 235 Neb. 409, 455 N.W.2d 554 (1990)).

ADDITIONAL QUESTIONING AFTER TRAFFIC STOP

Bryner argues that once the traffic stop was completed, the authority for the initial seizure ended. He asserts that the request to remain in the police cruiser to answer additional questions was a new seizure, because a reasonable person would not feel free to leave under such

circumstances. Further, Bryner contends that this seizure was unreasonable, in part because Mayo had no reasonable suspicion to justify detaining Bryner for the purpose of additional questioning.

The State in turn argues that because Bryner voluntarily consented to remain in the cruiser following the conclusion of the traffic stop, there was no unreasonable seizure under the Fourth Amendment. The State asserts that a reasonable person in Bryner's position would have felt free to decline the request for additional questioning and leave.

Upon our review of record, we find that the district court did not err in concluding Bryner waived the right to be free from unreasonable seizure. Regardless of whether Mayo's actions following the traffic stop amounted to a seizure, Bryner's clear, voluntary consent to answer additional questions amounted to such a waiver.

The totality of the circumstances, particularly as shown through the recording admitted at trial, contain no indication that Bryner's consent was the result of duress or coercion. Mayo concluded the traffic stop by providing Bryner with a warning and corresponding paperwork. Mayo then asked if Bryner would be willing to answer additional questions, to which he agreed. Mayo's tone of voice was friendly and non-confrontational. Because Bryner's consent was given voluntarily, he waived any argument that he was unreasonably seized.

The district court's finding that Bryner voluntarily consented to further questioning following the traffic stop was not clearly erroneous.

Bryner's first assignment of error is without merit.

### REQUESTS FOR CONSENT TO SEARCH AND CONDUCT POLICE CANINE SNIFF

Bryner argues that he was also unreasonably seized when, after he twice denied consent to search the vehicle, Mayo asked if he would consent to a police canine sniff. Bryner asserts that his consent to the dog sniff was invalid, because such consent was a mere submission to authority. Furthermore, Bryner claims that Mayo lacked reasonable suspicion such that would allow detention in the absence of valid consent.

The State responds by arguing that Bryner voluntarily consented to the police canine sniff, based in part on the casual and nonthreatening tone utilized by Mayo during his requests for consent. Alternatively, the State asserts that even if the consent was invalid, Mayo had reasonable suspicion sufficient to detain Bryner at the point of requesting a dog sniff. See *Anderson*, 258 Neb. at 635. (when no seizure occurs, such as in the event that voluntary consent is given, reasonable suspicion is not required).

Upon our review of record, we find that the district court did not err in concluding Bryner waived the right to be free from unreasonable seizure when he consented to Mayo's request to perform a dog sniff.

Bryner's consent to the dog sniff was not a mere submission to authority. There is no indication from the record that this decision was the result of Bryner's will being overborne or influenced by duress or coercion. Bryner previously denied Mayo's requests to personally search the vehicle, which denials were honored. Between the denials of consent to search the vehicle and Mayo's request to perform the dog sniff, his tone remained polite and unthreatening. Further, the length of time during which the questioning and requests for consent occurred was short. Based

upon these circumstances, Bryner could have reasonably believed that a denial of the request to allow the dog sniff would be honored.

Lastly, because Bryner's consent was valid, it is unnecessary for this court to consider whether reasonable suspicion existed justifying the detention of Bryner during this period. See *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015) (an appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it).

The district court's finding that Bryner voluntarily consented to the police canine sniff was not clearly erroneous.

Bryner's second assignment of error is without merit.

## CONCLUSION

Upon our review, we find that the district court did not err in denying Bryner's motion to suppress. Bryner consented to answering additional questions and the administering of a police canine sniff after the traffic stop. Therefore, we affirm.

AFFIRMED.